**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2003-KA-00876-SCT**

*OSCAR LEE GLASPER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/27/2002 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS |
| COURT FROM WHICH APPEALED: | HUMPHREYS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | LYDIA ROBERTA BLACKMON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: W. DANIEL HINCHCLIFF |
| DISTRICT ATTORNEY: | JAMES H. POWELL, III |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/10/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., EASLEY AND CARLSON, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     Upon being indicted by the Humphreys County grand jury on the charges of capital murder, rape, sexual battery, house burglary and kidnapping, Oscar Lee Glasper went to trial and was found guilty by the jury on all five of the indicted charges. After a sentencing hearing on the capital murder conviction,[1] the jury was unable to agree unanimously on the punishment, and the circuit judge imposed a life imprisonment without parole sentence as required by law.

---

[1]The capital murder charge alleged a killing during the commission of a robbery.  *See* Miss. Code Ann. § 97-3-19(2)(e).

*See* Miss. Code Ann. §§ 99-19-101(1), -103 (Rev. 2000); Miss. Code Ann. § 47-7-3(1)(e)(f) (Rev. 2004). As to the remaining convictions, the circuit judge imposed respective fifteen-year sentences for the rape and sexual battery convictions, and respective ten-year sentences for the house burglary and kidnapping convictions, with each of the five sentences to run consecutively.[2] After disposition of post-trial motions, the trial court granted Glasper's motion for an out-of-time appeal.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2. On Friday morning, May 26, 2000, Keith Crawford cut Flavis Sanders's lawn. Sanders, a 74-year-old single woman, was a retired Humphreys County deputy tax assessor. Crawford, who lived in Isola with his mother about two blocks from Sanders's home, had known Sanders all his life and had done work around her house for a long time. In addition to cutting the grass on this occasion, Crawford was to also replace the batteries in Sanders's doorbell and smoke alarms; however, since Sanders had failed to purchase the 9-volt batteries by the time Crawford finished cutting the lawn on Friday, Sanders and Crawford agreed that Crawford would simply return to Sanders's home around 10:00 a.m., Saturday, May 27, 2000, to complete his chores, at which time he would be paid.

¶3. When Crawford returned the next morning to complete his chores, he knocked on the front door of Sanders's house. When Sanders failed to respond to his knocks on the door,

---

[2]Although the applicable statutes provide that the jury may fix the punishment at life imprisonment upon a finding of guilt as to rape and kidnapping, we decipher from the record that the jury was not given the opportunity to consider the sentence of life imprisonment upon finding Glasper guilty of rape and kidnapping. *See* Miss. Code Ann. §§ 97-3-65(3)(a) & 97-3-53 (Rev. 2000). In any event, this issue is not before us in today's appeal.

Crawford, who was familiar with Sanders's habits and her home, walked around the outside of the house to the living room and knocked on the window, but again received no response from Sanders. Crawford then looked down to Sanders's bedroom window and noticed "the blind hanging out the window between the top sash and the bottom sash." Crawford knocked on the bedroom window and once again received no response. He then pulled the window blind up and saw Sanders lying in her bed, facing the window. Suspecting that "something was wrong," Crawford ran to Mrs. Clarence Abels's house, and Pat Abels, along with Crawford, returned to the Sanders home, at which time Abels concluded that Sanders was dead.

¶4.    Isola Police Chief J. D. Roseman was summoned to the scene by Pat Abels, and upon arriving at Sanders's home, Chief Roseman entered the home and went to the bedroom where he found Sanders, whom he believed to be dead, lying in the bed. Chief Roseman noticed blood on the bed sheets around the body in the buttocks area, and he also noticed that the bedside table had been knocked over and medicine bottles were scattered on the floor by the bed. Grady Lampkin, a Humphreys County deputy sheriff, arrived at the scene and secured the scene with police tape. Other law enforcement officials were dispatched to the scene, including Master Sergeant Tim Pyles, a criminal investigator with the Department of Public Safety, Mississippi Highway Patrol, Criminal Investigation Bureau, who photographed the scene. Personnel from the Mississippi Crime Laboratory were also summoned and they collected various items, including serological, fingerprint and hair samples.

¶5.    Further investigation by law enforcement revealed information which began to point toward Oscar Lee "Skip" Glasper as the prime suspect in this homicide investigation. Markelia

3

Ancreneka Ellzey, who knew both Glasper and Sanders, informed Chief Roseman that she had seen Glasper walking up and down the street close to Sanders's home around 2:00 a.m., Saturday, May 27, 2000. It was also learned that between 5:00 a.m. and 5:30 a.m., Saturday, May 27, 2000, an extremely intoxicated Glasper had approached Humphreys County deputy sheriff Randy Lee Blakely's vehicle outside the Belzoni Police Department and requested that Blakely "lock him up" for public drunkenness.[3] Glasper said he knew he had drunk too much, that he had been on his feet all night, and that he needed a place to lie down and sleep. Deputy Blakely turned Glasper over to the Belzoni Police Department, and a city officer indeed locked him up until mid-afternoon that day.

¶6. By the evening of May 30, 2000, law enforcement decided to arrest Glasper on an outstanding "peeping Tom" warrant. *See* Miss. Code Ann. § 97-29-61 (Rev. 2000), Mississippi's voyeurism statute. During the course of the day on Wednesday, May 31, 2000, Glasper gave three statements to law enforcement officials. The first statement was a tape-recorded statement which commenced at 10:40 a.m. The subsequently prepared transcript of this tape-recorded statement consists of 54 pages. A handwritten statement, consisting of one page, plus two lines on a second page, was taken at 1:25 p.m. The final statement was video-taped, and this statement commenced at 4:56 p.m. and concluded at 5:03 p.m. In both the handwritten statement and the video-taped statement, Glasper fully confessed to the crimes,

---

[3]Glasper would later admit that during the day and evening of May 26, 2000, and the early morning hours of May 27, 2000, he spent his entire $233 income tax refund on gambling, beer, whiskey, marihuana, and crack cocaine.

4

but stated that he never intended "to do any of this." Glasper stated that at the time of the crimes, he was "out of my mind" due to extreme intoxication from drugs and alcohol.

¶7. In addition to witness statements and Glasper's statements, law enforcement officials requested and received various reports from the state pathologist, the Mississippi Crime Lab, and Reliagene Technologies, which is a nationally accredited private DNA testing facility based in New Orleans.

¶8. In due course, the Humphreys County grand jury handed down a five-count indictment against Glasper, charging him with capital murder, rape, sexual battery, house burglary and kidnapping. At the ensuing trial, in addition to the testimony of Crawford, Ellzey, Roseman, Blakely, Lampkin, and Pyles, the State also offered the testimony of Kenneth Winter, Elizabeth Howell, Paul Wilkerson, and Joe Andrews, all from the Mississippi Crime Lab, as well as Nikia Redmond of Reliagene Technologies, Dr. Steven Timothy Hayne, a pathologist, and Zellie Shaw, Chief Deputy Sheriff of Humphreys County.

¶9. Using the automated fingerprint identification system (AFIS), Wilkerson, a latent fingerprint examiner at the Mississippi Crime Lab, determined that of the seven latent fingerprints and palm prints lifted from Sanders's bedroom window, six of these prints belonged to Glasper. The DNA evidence and trace evidence were inconclusive as to identifying Glasper. Dr. Hayne, senior pathologist at both Rankin County Medical Center and Madison County Medical Center, as well as Medical Director of the Renal Laboratories, and state pathologist for the Department of Public Safety, testified that the manner of Sanders's death was homicide and the cause of her death was strangulation. Among other evidence also

received at trial were the three statements given by Glasper to law enforcement officials on May 31, 2000. Chief Deputy Shaw was instrumental in the taking of these statements, and his trial testimony will be discussed later in this opinion.

¶10. At the conclusion of the guilt/innocence phase of the trial, the jury returned verdicts of guilty on all five counts of the indictment. At the conclusion of the sentencing phase of the trial, the jury was unable to unanimously agree on the punishment for capital murder, and the trial judge thus sentenced Glasper to serve a term of life imprisonment without parole. The trial judge also sentenced Glasper to serve separate fifteen-year sentences for rape and sexual battery and separate ten-year sentences for kidnapping and burglary of a dwelling, with all five sentences to be served consecutively. This appeal followed.

**DISCUSSION**

¶11. Glasper asserts that his three confessions were improperly admitted into evidence by the trial court; that his constitutional rights were violated because he was not provided an initial appearance before a magistrate; that his trial counsel rendered ineffective assistance; that the jury verdict was against the overwhelming weight of the evidence; and, that he was denied a fair trial based on the cumulative prejudicial effect of numerous errors committed at trial.

    **I.     WHETHER THE TRIAL COURT ERRED IN DENYING THE MOTION TO SUPPRESS THE CONFESSIONS.**

    **II.    WHETHER THE CONFESSIONS SHOULD HAVE BEEN SUPPRESSED UNDER THE "FRUIT OF THE POISONOUS TREE" DOCTRINE.**

6

¶12. We combine and discuss together these two assignments of error. Glasper asserts that the State failed to prove beyond a reasonable doubt that Glasper's confessions were intelligently, knowingly and voluntarily given; and, that the confessions were erroneously allowed into evidence since Glasper was arrested and initially interrogated on a peeping tom warrant. After a hearing, the trial court found that the motion to suppress should be denied, and that the 54-page transcript of Glasper's tape-recorded statement, his one page-plus hand written statement, and his video-taped confession, all given on May 31, 2000, should be allowed into evidence.

### A. The Transcript of the Suppression Hearing.

¶13. The State asserts that the issue of the voluntariness of the confessions is procedurally barred since the record before us does not contain a certified copy of the transcript of the trial court's suppression hearing. While the State acknowledges that the transcript of the suppression hearing is a part of Glasper's record excerpts, the State asserts that since the transcript is not a part of the official record before us, we cannot consider it.

¶14. We disagree with the State that Glasper is procedurally barred from attacking the admissibility of his confessions due to an incomplete record being before us on this issue. In attempting to convince us that this issue is procedurally barred, the State cites *Roy v. State*, 878 So.2d 84, 88 (Miss. Ct. App. 2003); and, *Roberts v. State*, 761 So.2d 934, 935 (Miss. Ct. App. 2000). However, these two decisions of the Court of Appeals involve cases where the defendants wholly failed to designate and include the portion of the record necessary to undergird an assignment of error. Here, Glasper's pro se "Designation of Record" stated that

7

the appellate record should consist of "[a]ll clerk's papers, trial transcripts, exhibits, orders, and all documents filed, taken, or offered in this case."

¶15.    Additionally, at the time same that Glasper's counsel filed the appellant's brief with us, she also filed an "Appellant's Record Excerpts," and an "Appellant's Addendum to Record (Exhibits)."    Included in the addendum is a 100-page transcript of a hearing conducted before the trial judge on November 5, 2001.   The cover page reveals that the transcript pertains to a motion hearing reported by "Deborah H. Nelson, CSR 1256."   On page 100 of the transcript is Ms. Nelson's   "Court Reporter's Certificate" stating, inter alia, "that the preceding and foregoing one hundred (100) pages contain a full, true and correct transcription of my shorthand notes."[4]

¶16.    The trial transcript, which is part of the official record before us, reveals that after opening statements, Glasper's attorney requested a motion hearing outside the presence of the jury, which request was granted by the trial court.   During the course of the discussion with the attorneys concerning certain motions, the trial court inquired "Does the State have the transcript on the suppression hearing?"   The prosecutor responded in the affirmative.   The trial transcript then reveals the following:

> [PROSECUTOR]: Here it is, Your Honor, on page 17 of the [suppression hearing] transcript.   Mr. Walls, I believe, asked these questions. I know you went into that house and I know you had sex with that woman, all right?  That was on the 31st.  What evidence did y'all have that he had done that?  There were some

---

[4]A review of this 100-page transcript reveals that approximately 93 pages is devoted to the suppression hearing concerning the confessions, while the remaining pages are devoted to arguments and rulings on other motions.

fingerprints inside the house. And you had matched those prints to him? Yes, sir.

When we refer to page 17 of the transcript of the suppression hearing, we find, verbatim, the testimony which the prosecutor quoted to the trial judge during the motion hearing commenced immediately after the opening statements to the jury.

¶17. During the State's direct examination of MHP-CIB Criminal Investigator Tim Pyles in the State's case-in-chief, the prosecutor refers to the suppression hearing transcript, and suppression hearing exhibits were retrieved for the purpose of introduction as trial exhibits. Additionally, when Glasper testified at trial, he stated before the jury, inter alia, that he was intoxicated at the time of his arrest, thus rendering any subsequent statements by him as involuntary due to his intoxication. During the District Attorney's cross-examination of Glasper, the following occurred:

Q. Well, the transcript of your testimony said that you had been drinking four or five quarts of beer.

A. No, I hadn't drunk that much.

Q. Two or three half pints of alcohol and had been smoking marihuana with a couple of fellows.

A. Is this a statement of mine?

Q. Yes, sir. This is your testimony from a hearing which was held on November 5, 2001.

************

A. Maybe Mr. Pyles kept cutting it [tape recorder] off when he wanted to interrogate me with the promises of favors in exchange for a lighter sentence.

Q. Right. But now you said in the statement when you testified again back in November of 2001 that as far as you knew it was running the whole time, right?

9

Q. Well, and we went through this back in November, I asked you about this back in November at that hearing that we held then, didn't we, didn't I?

A. You asking me about what?

\*\*\*\*\*\*\*\*\*\*\*\*

Q. Well, let's see what you – what you said. I asked you, Well, the videotape, was it cut on and off when you gave that statement?

> MR. WALLS: Mr. Powell, could you give me that page?

> MR. POWELL: Yes, page 88.

Q. Well, the videotape, was it cut on and off when you gave the statement?

> And your answer was, It was on.

> And I asked you, The whole time, and your answer was?

A. Are you asking me was the tape on?

Q. Right.

A. When I gave the statement, is that what you was asking me?

Q. Right. The videotape. Well, let's just read your answer. You tell me if I am reading it wrong. You answered me when I said, The whole time?

> You said, The whole time, but it wasn't on when Mr. Shaw first
> assured me of well, Skip, we are going to make sure, we are going
> to make sure that you're not going to get the death penalty or you
> get no strict and harsh punishment. With your cooperation, you
> give me a statement before this tape, and I am
> going to make sure, me and the rest of them, we are going to help
> you get a light sentence. Right. That is what you said. That was
> your answer. Did I read it correctly, Mr. Glasper?

¶18.    In referring to the District Attorney's cross-examination of Glasper at trial, we note that

on pages 79-80 of the suppression hearing transcript, we find Glasper's direct examination

testimony concerning the amount of alcohol he had consumed on the day of his arrest. At the suppression hearing, Glasper testified that he "[h]ad been drinking four or five quarts of beer, maybe two or three half a pint of alcohol" and "[m]e and a couple of fellows had been smoking marihuana." This is exactly what the District Attorney cross-examined

Glasper about at trial, in referring to the suppression hearing transcript. We also find at page 88 of the suppression hearing transcript, the District Attorney's cross-examination of Glasper concerning whether the tape was on the whole time during the interrogation of Glasper.[5] Finally, in referring to pages 88-89 of the suppression hearing transcript, we find the verbatim testimony to which the District Attorney is referring in cross examining Glasper at trial regarding his suppression hearing testimony about off-the-camera promises made by law enforcement during the course of his video-taped confession which commenced at 4:56 p.m. on May 31, 2000.

¶19.    When considering Glasper's pro se designation of the record, and when reading together the trial transcript and Glasper's addendum to the record, which consists primarily of the suppression hearing transcript, we deem it appropriate to consider this suppression hearing transcript in light of the fact that it was used extensively during the trial of this case, primarily in an effort by the State to impeach Glasper's in-court testimony before the jury. There is absolutely no question as to authenticity of this suppression hearing transcript. While there

---

[5]Admittedly, it is clear that at both the suppression hearing and the trial, Glasper attempted to clarify that he was stating that the tape recorder was not on during the entire interrogation which commenced at 10:40 a.m. on May 31, 2000. There appears to be confusion here as to whether the prosecutor was asking Glasper whether the audio-tape recorder or the video-tape recorder was running continuously.

is admittedly considerable incriminating evidence against Glasper in the record, the three confessions go to the very heart of the State's case against Glasper, and we will thus consider the transcript of the suppression hearing in determining whether the trial court appropriately denied Glasper's motion to suppress his confessions.

### B. The Suppression Hearing.

¶20. Glasper's primary claim is that his confessions were involuntary because he gave them only after law enforcement officials led him to believe that, if he cooperated, he would get a lighter sentence. Glasper also claims that he was "tricked" into giving additional statements after he informed the interrogating officers that he did not want to talk anymore. Additionally, Glasper claims that he was under the influence of drugs and alcohol on May 31, 2000, when he gave the three statements. The State counters that if we disagree with its claim of procedural bar concerning the suppression hearing transcript, then alternatively, Glasper's argument that his confessions were not voluntary is belied by the record.

¶21. In reviewing the trial court's denial of Glasper's motion to suppress his confessions, we apply the familiar general rule that since the trial court sits as the fact-finder when determining the issue of whether an accused's confession has been intelligently, knowingly and voluntarily given, we will only reverse the trial court's determination of this issue when such determination is manifestly wrong. *Manix v. State*, 895 So.2d 167, 180-81 (Miss. 2005) (citing *Horne v. State*, 825 So.2d 627, 639 (Miss. 2002) (other citations omitted)). We have also stated that we will not disturb the trial court's determination on the admissibility of a confession unless the trial court applied an incorrect legal standard, committed manifest error,

12

or rendered a decision which was contrary to the overwhelming weight of the evidence. *Thorson v. State*, 895 So.2d 85, 115 (Miss. 2004) (citing *Lee v. State,* 631 So.2d 824, 826 (Miss. 1994) (quoting *Balfour v. State*, 598 So.2d 731, 742 (Miss. 1992)). Additionally, there is no doubt that a confession is admissible only after the State has proven beyond a reasonable doubt that the accused's confession was voluntary by showing that such confession was not the product of promises, threats or inducements. *Manix,* 895 So.2d at 180 (citing *Miranda v. Arizona*, 384 U.S. 436, 444-45, 478-79, 86 S.Ct. 1602, 1612, 1630, 16 L.Ed.2d 694, 706-07, 726 (1966); *Dancer v. State*, 721 So.2d 583, 587 (Miss. 1998); *Morgan v. State*, 681 So.2d 82, 86 (Miss. 1996); *Chase v. State*, 645 So.2d 829, 838-39 (Miss. 1994)). *See also Haymer v. State*, 613 So.2d 837, 839 (Miss. 1993).

¶22. We turn now to the confessions. After his arrest on May 30, 2000, Glasper gave three statements to law enforcement officials on May 31, 2000. The first statement commenced at 10:40 a.m. and lasted for more than an hour. This statement was tape recorded and from this recording there was generated a 54-page written transcript. The second statement commenced at 1:25 p.m. and ended ten or fifteen minutes later, and consisted of a short statement written down by Chief Deputy Shaw and signed by Glasper. The third statement was a video-taped statement which commenced at 4:56 p.m. and concluded at 5:03 p.m. On each of these occasions, Glasper was given the *Miranda* warnings by law enforcement prior to giving the statements.

13

¶23. Concerning the 10:40 a.m. statement which took more than an hour, Glasper argues that during the various times that the tape-recorder was cut off, as reflected by the transcript of this recorded statement, law enforcement officials made promises to him for a lighter sentence which are thus not reflected in the transcript. Law enforcement officials who were present throughout the taking of this statement were Sgt. Pyles and Chief Deputy Shaw.[6] The transcript of this recorded statement further reveals that during the taking of the statement, Martin Frazure, an investigator with the District Attorney's office, entered the room and briefly interrogated Glasper and then left. According to Glasper, it is only because of these promises for leniency that he confessed to such heinous crimes and told law enforcement officials "what they wanted to hear." A careful review of the transcript of the tape-recorded statement reveals that the tape recorder was turned off five times. On pages 30-31 of the transcript, Pyles states that he is ending the interview "at this time," but immediately below this statement is the phrase "[t]ape starts again." On page 31 of the transcript, the tape is turned off and back on in order to switch to side two of the tape. On page 34 of the transcript, Shaw and Pyles are discussing taking a "dip" and the tape is cut off and then back on. On each of these occasions, while Pyles and Shaw ask probing questions of Glasper, he continues to deny having committed any crime as to Sanders. Finally, on pages 37-38, there are indications that the tape recorder was cut off twice. The transcript reveals the following:

Glasper: I, I (inaudible). I don't know anything about it.

[6]The record does reflect that during this statement, Shaw left the room for only a brief moment. We deduce this fact from the transcript which reveals on page 33 that "Shaw leaves the room," and then on page 34, Shaw inquires of Pyles, "You gotta dip?"

14

Pyles: You didn't do it and you don't know anything about it.

Glasper: I didn't do it and I don't know nothing about it. Nothing about it.

Pyles: You're sure.

Glasper: Um-hm.

Pyles: And that's the bottom line.

Glasper: That's the bottom line.

Pyles: Don't want to talk about it anymore.

Glasper: Nope.

Pyles: Alright (Tape turned off)

**(Mr. Martin Frazure, investigator with Humphrey's (sic) County D.A.'s Office enters)**

Pyles: I'm gonna turn the tape back on.

Glasper: Okay.

Frazure: You understand your rights.

Glasper: I understand.

Frazure: They've been read to you by Mr. Pyles with the MHP and uh, Chief Deputy uh, Shaw.

Glasper: Correct.

Frazure: Okay. Investigating this murder that happened up in Isola.

Glasper: I understand.

Frazure: Okay. We've got some pretty good evidence against you, okay?

Glasper: I understand.

15

Frazure: Uh, I'm gonna give you an opportunity to tell me the truth of what happened. My boss, District Attorney, Mr. Powell, I'll sit down with him and go over everything that you, your statement that you've given us, your cooperation and all that, okay?

Glasper: I understand.

Frazure: And uh, if you cooperate, I'll tell him and if, you know, I can't promise you anything, but you know, it could help you down the line. But uh, if you make us...get all the physical evidence and you don't assist us, then it's gonna be, it's gonna be, we're gonna put everything we can on you, okay? (Inaudible) So you need to be straight up with me right now. I'm not gonna play with you. I'm gonna, I'm not gonna stay over here all afternoon. And I'm not gonna beg you. I'm gonna give you an opportunity to help yourself right now by telling me the truth. Because we get the physical evidence piled up against you and uh, you need to tell me what happened. I know you went in that house. I know you went in that house and I know you had sex with that woman. So I know that. And I need you to tell me why you did it and how you did it. Just be honest. You need to get it off your chest and I need to get this case solved because we've got more than this. We can't spend all our time on this one case. But I'm gonna give you just one opportunity. I ain't gonna come back, like I say, I ain't got time to fool with you. We'll just get the evidence that we got and we'll prosecute you, okay?

Glasper: Alright.

Frazure: So I'm giving you this opportunity for you to tell me what happened.

Glasper: Well, it's like I told the investigators, I told `em everything I knew. From where I was between that Friday up until the time it happened throughout the night. And, like I say, I don't have nothing to do with it. And that is it. I didn't have nothing to do with it. (Taped turned off) (Taped turned on)[7]

Glasper: I might as well.

Pyles: (Inaudible) come on.

---

[7]Pyles testified at the suppression hearing that at this point in the interrogation, Frazure got up and left the room, and in the process of getting up out of his chair, Frazure accidently bumped the table, thus knocking the tape recorder off the table, causing it to shut off when it hit the floor, and that was the only reason that the tape recorder was "turned off and on," at that particular time.

Glasper: I didn't do this stuff.  (Inaudible) situation on (inaudible).  And then, it wouldn't be right to admit to something you didn't do...just because you the one being accused.  But, then again, (inaudible) I really don't know how to tell you this.  I just don't know how to say this, I really don't.[8]

¶24.     Glasper then continued his denial of having killed Sanders and having had sex with Sanders, but he did admit at this point to breaking into Sanders's house and robbing Sanders of "[t]wo dollars and some change." Glasper then gave the details as to how he broke into the house and the conversation he had with Sanders once inside the house.  Later on during the interview, Glasper finally admitted to having sex with Sanders but continued to deny that he had killed her.   Glasper blamed his actions that night on being "messed up" on drugs and alcohol.

¶25.     The second statement taken at 1:25 p.m. was written down by Shaw as Glasper spoke. Glasper signed the statement, and Shaw signed as a witness. This statement lasted approximately ten or fifteen minutes and was taken down on the standard "Voluntary Statement" form utilized by law enforcement; therefore, this statement contained the *Miranda* warnings and voluntary waiver language.  At the suppression hearing, Shaw testified that his reason for taking this second statement after the lengthy first statement was to "clarify some things" in Glasper's first statement. In this statement, Glasper admitted to breaking into the house and robbing and raping Sanders; however he continued to deny killing Sanders, although, he admitted in the statement that he covered Sanders's mouth with his hand to "stop her from hollering real bad," and that after he finished the act, "she stopped hollering."   This statement

---

[8]Despite Glasper's assertions that Frazure induced him to give a confession by making promises to him for a lighter sentence if he cooperated, Frazure's statements to Glasper evidently had little effect on Glasper, because Glasper continued his denials [i.e., "I didn't do this stuff."]

ends as follows: "I didn't intend to do any of this. I was out of my mind. I was intoxicated and under the influence of drugs."

¶26. The third and final statement was videotaped and lasted approximately seven minutes. In this statement, Glasper confessed to breaking into the house and robbing and raping Sanders, but he again fell short of an admission as to the killing of Sanders. Glasper did state that Sanders had "quit hollering" when he left the house, and Glasper expressed remorse over what happened to Sanders and said he did not intend that she die.

¶27. At the suppression hearing, Glasper testified on direct examination that promises for leniency were continuously made by law enforcement officials in return for his "confessions;" however, the District Attorney's cross-examination of Glasper reveals the following:

> Q. Well, of course, at the end of the tape, the videotape, you had gone through it, it's relatively short, you're advised of your rights at the first of it, right?
>
> A. Correct.
>
> Q. Then at the end of it, after you said all of this, aren't you asked by Deputy Shaw, "Mr. Glasper, isn't it true that nobody has promised you anything or gave you any hopes or reward in order to get you to make this statement?"
>
> A. No.
>
> Q. That's not on the videotape?
>
> A. No.
>
> Q. Because if that were on there, you would have taken that opportunity, since you had been promised all of this, and say that since you made all of these promises to me, when he said nobody has promised you anything, you would

have stood up and said, "No, now wait a minute. Y'all had promised me a lighter sentence for telling you the truth about this," wouldn't you?

A. Exactly correct, but if it's not on there, it's probably beyond my whereabouts as to when he said this. I probably wasn't paying any attention, if it's on there.

Q. So you're no longer denying that it's on there, because now you remember that they probably did ask you that on there, don't you?

A. No, because I do not remember that. As a matter of fact, I would say, more than you're trying to say, that they haven't said it on there.

Q. Well, it's one way or the other. If they asked you that, you would have taken that opportunity to say –

A. I would have.

Q. "Whoa, you promised me this out here" because you were on videotape and you want everybody to know what you had been promised in order to give this statement; right?

A. Right.

Q. And you would certainly have taken advantage of that opportunity, wouldn't you?

A. I certainly would have.[9]

¶28. The trial court conducted a lengthy suppression hearing in which all law enforcement officials who were involved in the taking of these three statements were called to testify and subjected to cross examination by defense counsel. *See Agee v. State*, 185 So.2d 671, 673 (Miss. 1966). Glasper also testified. Regardless of the number of appellate judges who now,

---

[9]Our review of the video-taped confession in fact reveals that at the beginning of the tape, Chief Deputy Shaw verbally advised Glasper of his *Miranda* rights and Glasper stated that he understood. Glasper then signed the *Miranda* rights form and waiver as did the law enforcement officials as witnesses. At the end of the videotaped interview, Glasper, in response to Chief Deputy Shaw's questions, acknowledged that he had given the statement freely and voluntarily, without any promises, threats or coercion by anyone.

19

or in the future, review this case, the trial judge in this case is the only one amongst the members of the judiciary who will ever have the opportunity to not only *hear* the testimony, but to also *observe the demeanor* of the witnesses as they testified at the suppression hearing. We thus afford the appropriate deference to the trial judge since she was the ultimate fact-finder based on disputed testimony offered at the suppression hearing. *See Culbreath v. Johnson*, 427 So.2d 705, 708-09 (Miss. 1983). The trial judge made specific findings that Glasper's three statements "were not made as a result of duress, coercion, threats or promises, nor while [Glasper] was under the influence of drugs or alcohol." The trial judge likewise found that after reviewing the video-taped confession, Glasper was not "coerced or under the influence of any drugs or alcohol while giving his video recorded statement." The trial judge thus denied the motion to suppress the statements based upon a specific finding that Glasper's statements "were freely and voluntarily given." In making a determination that Glasper's confessions were admissible, the trial judge did not apply an incorrect legal standard, commit manifest error, or make a decision which was contrary to the overwhelming weight of the evidence. *Thorson*, 895 So.2d at 115. Thus, we refuse to find error in the trial court's denial of Glasper's motion to suppress these three statements. This assignment of error is without merit.

### C. *Fruit of the Poisonous Tree.*

¶29. Glasper likewise asserts that the first statement was illegal since it was induced by promises or hopes of reward by way of a lighter sentence in return for his cooperation in

20

telling the law enforcement officials "what they wanted to hear." Additionally, Glasper claims that since he was pretextually arrested on an outstanding voyeurism warrant so that law enforcement officials could interrogate him about the Sanders murder, the first statement was illegal. Thus, according to Glasper, the second and third statements were products of the first illegal statement; therefore, these statements are likewise illegal as "fruit of the poisonous tree."

¶30. On the other hand, the State argues procedural bar, asserting that while Glasper certainly attacked the admissibility of his confessions by way of a motion to suppress, claiming that the confessions were illegally induced by law enforcement, Glasper never submitted to the trial judge that the statements were inadmissible as fruit of the poisonous tree. The State is correct. In the written motion to suppress, Glasper asserts only that "[t]he statements were not free (sic) and voluntarily given," and that "[p]olice illegally induced statements and we believe violated the rights of [Glasper]." Nowhere in the trial record does Glasper present to the trial court the "fruit of the poisonous tree" argument as grounds for suppressing one or more of the statements. This issue was not raised in the motion to suppress or in post trial motions, nor was the issue orally argued before the trial judge.[10] Failure to raise an issue at trial bars consideration by the appellate court. *Smith v. State*, 729 So.2d 1191, 1201 (Miss. 1998) ("trial judge will not be found to have erred on a matter not presented to him for decision"). *See also Acker v. State*, 797 So.2d 966, 971 (Miss. 2001).

---

[10]In the j.n.o.v/new trial motion, Glasper makes only the general assertion that the trial court erred "in overruling the objections made by the attorney for defendant to evidence offered by the State."

21

¶31. Procedural bar notwithstanding, we will address the merits of Glasper's "fruit of the poisonous tree" argument. In support of this argument, Glasper relies on *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). In *Brown*, the police arrested Brown without probable cause for the purpose of questioning him as a part of an ongoing murder investigation. The United States Supreme Court addressed the issue of admissibility of the subsequently obtained confession on not only Fifth Amendment grounds, but also Fourth Amendment grounds. The Court held that the mere fact that Brown was properly advised of his *Miranda* rights did not invoke a per se rule of admissibility of the confession. The Court stated:

> While we therefore reject the per se rule which the Illinois courts appear to have accepted, we also decline to adopt any alternative per se or 'but for' rule. The petitioner himself professes not to demand so much....The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, *see Johnson v. Louisiana*, 406 U.S. 356, 365, 92 S.Ct. 1620, 1626, 32 L.Ed.2d 152 (1972), and, particularly, the purpose and flagrancy of the official misconduct are all relevant. See *Wong Sun v. United States*, 371 U.S., at 491, 83 S.Ct. at 419.[11] The voluntariness of the statement is a threshold requirement. Cf. 18 U.S.C. s 3501.

422 U.S. at 603-04, 95 S.Ct. at 2261-62.

---

[11]The full cite for *Wong Sun* is 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

¶32. While we wholeheartedly agree with the principles set out in **Brown**, it is inapplicable here. Glasper was not indiscriminately pulled in off the street by way of an investigatory arrest for the sinister purpose of trying to find out what he knew about the Sanders case. Sgt. Pyles testified at the suppression hearing that Glasper's name surfaced during the investigation of Sanders's murder "as someone who had been in the street around Ms. Sanders's house the night that she was apparently killed." Glasper's name surfaced when Markelia Ellzey, who knew both Glasper and Sanders, approached Chief Roseman and volunteered the fact that she had seen Glasper wandering the street near Sanders's home at 2:00 a.m. on the morning that Sanders's body was discovered. Additionally, Chief Deputy Sheriff Zellie Shaw testified at the suppression hearing that once the investigation revealed that Sanders had been sexually assaulted, that Glasper had been seen in the vicinity of Sanders's home on the date of the crime, and that Glasper had an outstanding voyeurism warrant, the investigation began to focus on Glasper as a prime suspect in the Sanders case.

Thus, **Brown** is easily distinguishable from today's case. Because we find that Glasper's first statement was not taken in violation of the Fourth, Fifth or Fourteenth Amendments, thus rendering his first statement legal and admissible, Glasper's "fruit of the poisonous tree" argument fails. *See **Carr v. State***, 873 So.2d 991, 1001 (Miss. 2004); ***Byrom v. State***, 863 So.2d 836, 856-57 (Miss. 2003); ***Jones v. State,*** 841 So.2d 115, 138 (Miss. 2003); ***Conerly v. State***, 760 So.2d 737, 741-42 (Miss. 2000). We thus find this assignment of error to be without merit.

23

### III. WHETHER GLASPER'S CONSTITUTIONAL RIGHTS WERE VIOLATED FOR FAILURE TO PROVIDE AN INITIAL APPEARANCE.

¶33. Glasper asserts that because of the delay in providing him an initial appearance before a neutral magistrate where he would have been advised of his constitutional right to remain silent, law enforcement officials were able to get Glasper to finally succumb to pressure and confess to these heinous crimes. Glasper also complains of the fact that "it does not appear that [he] was ever provided a preliminary hearing." The Mississippi Uniform Rules of Circuit and County Court Practice govern initial appearances and preliminary hearings in criminal cases. URCCC 6.03 states:

> Rule 6.03    INITIAL APPEARANCE
>
> Every person in custody shall be taken, without unnecessary delay and within 48 hours of arrest, before a judicial officer or other person authorized by statute for an initial appearance.
>
> Upon the defendant's initial appearance, the judicial officer or other person authorized by statute shall ascertain the defendant's true name and address, and amend the formal charge if necessary to reflect this information. The defendant shall be informed of the charges against him/her and provided with a copy of the complaint. If the arrest has been made without a warrant, the judicial officer shall determine whether there was probable cause for the arrest and note the probable cause determination for the record. If there was no probable cause for the warrantless arrest, the defendant shall be released. The judicial officer shall also advise the defendant of the following:
>
> 1. That the defendant is not required to speak and that any statements made may be used against him/her;
>
> 2. If the defendant is unrepresented, that the defendant has the right to assistance of an attorney, and that if the defendant is unable to afford an attorney, an attorney will be appointed to represent him/her;
>
> 3. That the defendant has the right to communicate with an attorney, family or friends, and that reasonable means will be provided to enable the defendant to do so;
>
> 4. Conditions under which the defendant may obtain release, if any;

> 5. That the defendant has the right to demand a preliminary hearing while the defendant remains in custody.

URCCC 6.04 provides that an accused is entitled upon demand to a preliminary hearing where the judicial officer will determine whether the evidence presented creates a probable cause that a criminal offense has been committed and that the accused committed this offense. If the judicial officer should find the evidence sufficient to bind the accused over to the grand jury, the judicial officer then determines whether the accused is entitled to release from custody pending grand jury action, and if so, then the conditions of the release.

¶34.    We have made it abundantly clear that uniform rules violations do not necessarily rise to the level of a constitutional violation.  *Lawrence v. State,* 869 So.2d 353, 356 (Miss. 2003).  However, Glasper does claim that upon his arrest on the night of May 30, 2000, he was "interrogated for hours," during which time, he was not allowed to make any telephone calls, nor was he allowed to communicate in any fashion with his family members, friends, or a lawyer.  Thus, Glasper concludes that "[g]iven the foregoing facts and the fact that he was unable to communicate with anyone other than the detectives who were imposing tremendous pressure on him to confess, and to whose pressure he eventually succumbed and confessed, [he] contends that both his state and federal rights were violated."

¶35.    In an effort to convince us to find the confessions to be illegal based on a violation of URCCC 6.03, Glasper relies on *Abram v. State*, 606 So.2d 1015, 1029 (Miss. 1992).   In *Abram*, the defendant was arrested and then incarcerated and interrogated over a three-day period without an initial appearance, resulting in an eventual confession to two charges of

25

capital murder and one charge of armed robbery. This Court concluded that law enforcement officials would have never obtained an "uncounseled confession" from Abram but for the authorities' failure to comply with the initial appearance rule, thus depriving Abram of access to counsel. *Id.* at 1029. The Court in *Abram* also found that such error could not be deemed harmless since the capital murder conviction "was based entirely on his confession." *Id.*

¶36. Our case today is clearly distinguishable from *Abram*, where there was a clear violation of the rule and Abram's confession was the sole basis for the conviction. Glasper's confessions were given within twenty-hours of his arrest, well within the 48-hour provision for an initial appearance under URCCC 6.03. Additionally, Glasper's confessions did not constitute the sole basis for his convictions. Markelia Ellzey's testimony put Glasper within feet of the scene of the crime within hours of the discovery of Sanders's body. Paul Wilkerson of the Mississippi Crime Lab testified that of the seven latent fingerprints/palm prints recovered from Sanders's bedroom window, six of the prints belonged to Glasper. Nikia Redmond of Reliagene Technologies examined known blood samples of Glasper and the victim, the vaginal and rectal swabs of the victim, and the stains recovered from the victim's nightgown. While Redmond unhesitatingly testified that her testing was inconclusive as to Glasper, she did testify that "the alleles [small portions of genetic markers] that I marked in blue marker are consistent with the genetic profile at the same positions with Oscar Glasper, but as I said before, it is not enough information to conclusively draw the conclusion that he is the donor of the sperm." Still, Redmond's testimony was properly before the jury for the jury to give it such weight and credit as the jury deemed appropriate, in conjunction with the

26

other evidence before the jury. Also, the District Attorney's grueling cross-examination of Glasper before the jury certainly could have had an adverse effect on Glasper's defense in the eyes of the jury. In fact, a review of the totality of Glasper's testimony before the jury could cause one to conclude that Glasper hardly enamored himself to the jury.

¶37. Even if we were to find a URCCC 6.03 violation, which we do not, Glasper would have to show that the delay in providing him an initial appearance caused him to suffer some prejudice. We addressed this precise issue in *Jones v. State,* 841 So.2d 115 (Miss. 2003). We stated:

> It is well established that the failure to provide an initial appearance for an accused within the time provided is not, of itself, a reason to suppress a confession. *Davis v. State,* 743 So.2d 326, 337 (Miss.1999). In *Morgan v. State,* 681 So.2d 82 (Miss.1996) and *Veal v. State,* 585 So.2d 693 (Miss.1991), this Court found that a violation of Rule 6.03 alone will not result in the suppression of evidence or reversible error where the defendant was informed of his rights and made a knowing and voluntary waiver. *But see Gordon v. State,* 160 So.2d 73 (Miss.1964); *Parker v. State,* 244 Miss. 332, 141 So.2d 546 (1962) (holding that considerable delay in providing an initial appearance alone can be reversible error).
>
> ***********
>
> The statement given by Jones on January 12 was completely incriminating, sufficient to prosecute him for Wilkerson's murder, and well within the 48 hour period. Therefore, the delay in providing Jones an initial appearance caused him no prejudice. A timely initial appearance in Mississippi might have resulted in less evidence being gathered, but it would not have resulted in suppression of the evidence against Jones to the extent where there is any reasonable probability that the verdict would have changed.

841 So.2d at 132, 133-34. Certainly, in today's case, Glasper has wholly failed to show that his failure to receive an initial appearance prior to his being interrogated by law enforcement,

27

was an unnecessary delay which resulted in prejudice to him.[12]  We thus find this assignment of error to be without merit.

## IV. WHETHER GLASPER'S TRIAL COUNSEL WAS INADEQUATE AND INEFFECTIVE.

¶38.  Glasper claims that his trial attorney was ineffective because he "failed to file critical motions, failed to subject the State's case to a meaningful adversarial setting, and failed to investigate all of the information relating to his innocence," thus depriving him of a fair trial as guaranteed under our state and federal constitutions.  In addressing claims of ineffective assistance of counsel, we apply the familiar standard established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We have had numerous occasions in the past to address similar claims and apply the *Strickland* criteria. We recently stated:

> "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A defendant must demonstrate that his counsel's performance was deficient and that the deficiency prejudiced the defense of the case. *Id.* at 687, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. "Unless a defendant makes both showings, it cannot be said that the conviction.......resulted from a breakdown in the adversary process that renders the result unreliable." *Stringer v. State*, 454 So.2d 468, 477 (Miss.1984) (citing *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. 2052). The focus of the inquiry must

---

[12]Even though URCCC 6.03 provides for an initial appearance within 48 hours of arrest, we understand Glasper to assert that if he had been provided an initial appearance prior to being interrogated by law enforcement officials (which interrogation and resulting statements occurred within 24 hours of his arrest), a neutral magistrate would have informed him of his right to remain silent and his right to counsel, and he thus would not have given these statements to law enforcement.

be whether counsel's assistance was reasonable considering all the circumstances. *Id.* Judicial scrutiny of counsel's performance must be highly deferential. (citation omitted) ... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

*Stringer,* 454 So.2d at 477 (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). Defense counsel is presumed competent. *Id.*

> Then, to determine the second prong of prejudice to the defense, the standard is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mohr v. State,* 584 So.2d 426, 430 (Miss.1991). This means a "probability sufficient to undermine the confidence in the outcome." *Id.*
>
> \*\*\*\*\*\*\*\*\*\*\*
>
> There is no constitutional right then to errorless counsel. *Cabello v. State,* 524 So.2d 313, 315 (Miss.1988); *Mohr v. State,* 584 So.2d 426, 430 (Miss.1991) (right to effective counsel does not entitle defendant to have an attorney who makes no mistakes at trial; defendant just has right to have competent counsel).

*Puckett v. State*, 879 So.2d 920, 935-36 (Miss. 2004) (quoting from *Brown v. State,* 798 So.2d 481, 493-94 (Miss.2001)).

¶39.    Applying the *Strickland* criteria as we discussed in *Puckett*, we now consider Glasper's claims of his trial counsel's ineffectiveness.  Glasper asserts that "[i]t appears that [he] did not receive a timely initial appearance," and that his trial attorney should have therefore filed a motion to dismiss, or at the very least, a motion for Glasper to be released from incarceration.

Glasper also asserts that the failure to provide a timely initial appearance should have been argued by his trial counsel to the trial court as an additional ground on which to suppress the confessions. Additionally, Glasper claims that the trial record does not reflect that his trial counsel filed a motion for a judgment notwithstanding the verdict. Thus, Glasper alleges that his trial counsel's failure to file these "critical motions" resulted in his trial counsel's rendering ineffective assistance. In his claim that his trial counsel did not "subject the State to an adversarial setting," Glasper again asserts that his lawyer (1) failed to inform the trial court of Glasper's not receiving a timely initial appearance to the trial court's attention, (2) failed to question witnesses about inconsistencies in their out-of-court statements as compared to their in-court testimony, and (3) failed to learn the facts surrounding Glasper's arrest on the voyeurism charge. Finally, Glasper asserts that his trial counsel was ineffective due to his failure to investigate to the extent necessary to learn the names and whereabouts of potential witnesses who would have been beneficial to Glasper's case.

¶40. We first note that while Glasper refers us to *Strickland* and various decisions from this Court for the appropriate criteria we are to consider in reviewing claims of ineffective assistance of counsel, Glasper has wholly failed to cite to us a single case to support his specific claims of ineffectiveness of his trial counsel by allegedly failing to file critical motions, failing to invoke the adversarial process, and failing to investigate. Our cases are legion where we have stated that the failure to cite authority in support of an argument eliminates our obligation to review the issue. *Byrom v. State*, 863 So.2d 836, 863 (Miss. 2003) (citing *Simmons v. State*, 805 So.2d 452, 487 (Miss. 2001), and *Williams v. State*, 708

30

So.2d 1358, 1362-63 (Miss. 1998)). Thus this issue is procedurally barred; however, procedural bar notwithstanding, we briefly discuss Glasper's claims of ineffective assistance of counsel. Succinctly stated, they are wholly without merit. We have already discussed in Issue III, supra, the initial appearance issue. Suffice it to state here that since Glasper confessed to these crimes within twenty-four hours of his arrest, well within the 48-hour period specified in URCCC 6.03, it is highly unlikely that the trial court would have given any serious consideration to suppressing these confessions because of the fact that Glasper had not been provided an initial appearance prior to his confessions. Also, given the nature of the charges, the possibility of pre-trial bail was most likely non-existent, and there was certainly no basis for the granting of a motion to dismiss.

¶41. While we acknowledge that the most experienced criminal defense attorney is not incapable of rendering ineffective assistance in any particular case, we note here that Glasper had a very experienced criminal defense attorney whose performance in this case is well beyond the realm of ineffectiveness. Glasper's trial attorney, inter alia (1) filed in excess of twenty pre-trial motions; (2) vigorously attacked the confessions via a motion to suppress, resulting in a lengthy suppression hearing; (3) effectively cross-examined the State's witnesses, including the expert witnesses; (4) made appropriate objections during the trial; (5) submitted proper jury instructions, objected to certain jury instructions submitted by the State, and suggested revisions to some of the State's proposed instructions; and, (6) made effective closing arguments in both phases of the trial. We likewise cannot overlook the obvious – the impassioned plea of Glasper's trial attorney during the closing arguments of the sentencing

31

phase of the trial most likely saved Glasper's life. After deliberating on the sentence as to the capital murder conviction, the jury returned a verdict which stated, "We, the jury, are unable to agree unanimously on punishment on Count I." After the reading of the verdict in open court, the trial judge inquired of the jury, "Is this a unanimous verdict?" The jury members responded in unison, "[y]es."

¶42. Likewise, we have throughly examined the record for any indication that Glasper's trial attorney "failed to subject the State to an adversarial setting," as asserted by Glasper, and we are simply unable to find anything in the record to undergird this assertion. Glasper also alleges numerous instances of his trial counsel's failure to take further action to investigate facts, seek out witnesses, and uncover inconsistencies in witness statements. We can best address these assertions by again stating that there is nothing in *Strickland*, or any of our decisions, which states that a criminal defendant is entitled to a lawyer who will try a perfect case and commit no error. While we have not discussed here each and every allegation of trial counsel's ineffectiveness, as set out by Glasper, we have considered them and find them to be without merit. All of this having been said, we find that Glasper has wholly failed to convince us that his trial counsel rendered ineffective assistance. Without question, Glasper has failed to demonstrate that his trial attorney's performance was deficient and that the deficiency prejudiced the defense of his case. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. This issue is without merit.

### V. WHETHER THE JURY'S VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.

¶43. In alleging that the trial court erred in refusing to grant a new trial, Glasper asserts that the jury's verdict was contrary to the weight of the evidence. *See* URCCC 10.05 (2). As we have recently noted, it is not uncommon for defendants in criminal cases to blur the arguments regarding the legal sufficiency of the evidence as opposed to the overwhelming weight of the evidence. ***Bush v. State***, 895 So.2d 836, 843 (Miss. 2005). When we are confronted with a claim that the trial court erred in failing to grant a motion for a judgment notwithstanding the verdict, we are called upon to consider the legal sufficiency of the evidence. ***Id.*** However, when, as here, a criminal defendant on appeal attacks a trial court's refusal to grant a new trial, we consider a standard of review different than that considered in review of a denial of a j.n.o.v. motion.

> When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. ***Herring v. State,*** 691 So.2d 948, 957 (Miss.1997). We have stated that on a motion for new trial,
>
>> the court sits as a thirteenth juror. The motion, however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.

895 So. 2d at 844 (quoting ***Amiker v. Drugs For Less, Inc***., 796 So.2d 942, 947 (Miss. 2000)). Additionally, the evidence is viewed and weighed in the light most favorable to the verdict of the jury. ***Herring***, 691 So.2d at 957.

¶44. Glasper addresses this issue by submitting "questions, inconsistencies or discrepancies" which "would or should have raised a reasonable doubt in the minds of the

33

jurors" concerning the confessions such as the "constant threats, pressure, trickery, innuendo and promises" made by the interrogating officers; the "suddenness" of the confession; the recorder being cut on and off throughout the tape-recorded statement; and, the "lack of evidence" concerning the reading and explanation of the *Miranda* rights to Glasper. Likewise, Glasper asserts that a reasonable doubt should have been raised in the minds of the jurors as to Ellzey's credibility when the jury heard the inconsistencies between her trial testimony and her prior out-of-court statements. Glasper also claims that the fingerprint testimony was highly suspect and there was a lack of DNA evidence. In making these various assertions, Glasper has presented to us "a classic jury case." Indeed this evidence was quite appropriately submitted to the jury so that the jury could determine what weight and credit it chose to give to this evidence. Certainly, in considering all the evidence presented to the jury in the light most favorable to the verdict, we unhesitatingly find that the verdict was not contrary to the overwhelming weight of the evidence such that to leave the verdict undisturbed would sanction an unconscionable injustice. Accordingly, we find this assignment of error to be meritless.

## VI. WHETHER THE CUMULATIVE ERRORS DENIED THE DEFENDANT A FAIR TRIAL.

¶45. Finally, Glasper asserts that even if we should find that none of his numerous alleged errors, when standing alone, would warrant reversal, the cumulative prejudicial effect of these "non-reversible errors," when considered together, require reversal. Glasper cites one case in support of this proposition – *Hansen v. State,* 592 So.2d 114, 142 (Miss. 1991). In *Hansen*, a death penalty case, we stated:

34

[H]ansen cites our familiar rule which goes back at least to **Russell v. State**, 185 Miss. 464, 469 189 So. 90, 91 (1939), which held:

> It is true that not one of these errors, when considered separately and apart from the others, is sufficient to justify a reversal of the case, but when they are considered as a whole it is ou[r] view that they resulted in the appellant being denied a fair trial....

> This rule has been recognized in numerous later cases, *e.g., **Griffin v. State**,* 557 So.2d 542, 553 (Miss.1990); **Shell v. State**, 554 So.2d at 906; **Stringer v. State**, 500 So.2d 928, 939 (Miss.1986); **Williams v. State**, 445 So.2d 798, 810 (Miss.1984).

592 So.2d at 142. Unquestionably, this "cumulative-effect-of-error" rule applies to capital and non-capital cases as well. As an aside, the term "capital case" is sometimes mistakenly believed to apply only to death-penalty cases; however, a capital case as defined by statute is one which involves a crime punishable by death or life imprisonment. Miss. Code Ann. § 1-3-4 (Rev. 2005). Glasper's case was tried as a death penalty case; however, since the jury could not unanimously agree on the punishment upon his conviction of capital murder, the trial judge sentenced Glasper to a term of life imprisonment as required by statute. Certainly we may consider this "cumulative-effect-of-error" issue, whether Glasper's case is described as a death penalty or non-death penalty case, or a capital or non-capital case. See **Byrom**, 863 So.2d at 846-47.

¶46. We have already determined that there is no error in the record requiring reversal. Any such errors as may be revealed in the record are harmless beyond a reasonable doubt. In **Byrom,** we clarified our position regarding the cumulative effect of error by stating:

> What we wish to clarify here today is that upon appellate review of cases in which we find harmless error or any error which is not specifically found to be reversible in and of itself, we shall have the discretion to determine, on a case-by-case basis, as to whether such error or errors, although not reversible when standing alone, may when considered cumulatively require reversal because of the resulting cumulative prejudicial effect.

*Id.* at 847. We find upon a meticulous review of the record that not only were there no individual reversible errors committed during the trial, the cumulative effect of any harmless errors committed during this trial was not such that it deprived Glasper of a fundamentally fair and impartial trial. Thus, we find that since "there was no reversible error in any part....there is no reversible error to the whole." *McFee v. State*, 511 So.2d 130, 136 (Miss. 1987). This issue is, therefore, without merit.

## CONCLUSION

¶47. For these reasons, we affirm the Humphreys County Circuit Court's judgment of conviction and resulting sentences imposed upon Oscar Lee (Skip) Glasper, for capital murder, rape, sexual battery, burglary of a dwelling, and kidnapping.

¶48. **COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT, WITHOUT PAROLE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF RAPE AND SENTENCE OF FIFTEEN (15) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT III: CONVICTION OF SEXUAL BATTERY AND SENTENCE OF FIFTEEN (15) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT IV: CONVICTION OF BURGLARY OF A DWELLING HOUSE AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT V: CONVICTION OF KIDNAPPING AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCES IN EACH COUNT SHALL RUN CONSECUTIVELY.**

**SMITH, C.J., WALLER, P.J., EASLEY, GRAVES, DICKINSON AND RANDOLPH, JJ., CONCUR. COBB, P.J., CONCURS IN RESULT ONLY. DIAZ, J., NOT PARTICIPATING.**