601 So.2d 407 (1992)
James T. SHAMBLIN
v.
STATE of Mississippi.
No. 89-KA-0709.
Supreme Court of Mississippi.
June 3, 1992.
*408 Boyd P. Atkinson, Cleveland, for appellant.
Michael C. Moore, Atty. Gen., Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and PITTMAN and BANKS, JJ.
HAWKINS, Presiding Justice, for the Court:
James T. Shamblin appeals from his conviction in the circuit court of Bolivar County of two counts of sexual battery and two counts of touching a child for lustful purposes. He was sentenced to fifteen (15) years for the sexual battery convictions and five (5) years for the latter convictions in the Mississippi Department of Corrections, with the sentences to run concurrently. Finding no error, we affirm.

FACTS
James T. Shamblin and his first wife had five children, namely:[1] Edward Martin, Cynthia Lynn, Jeffrey Dale, Samuel Dean, and Amanda Clare. In 1977, when Amanda Clare was two years old, Shamblin's first wife died. Shortly thereafter he remarried a widow, and she helped rear his younger children who were still at home. Mrs. Shamblin also had children from a previous marriage.
In 1988 Shamblin and Mrs. Shamblin lived in Cleveland, along with Samuel, 16, and Amanda, 13 years of age.[2] Shamblin, 56 years old, and Mrs. Shamblin were both employed by area industries.
On November 16, 1988, Amanda telephoned her sister, Mrs. Cynthia Collins in Drew, reporting that Shamblin had sexually molested her; she was crying. Mrs. Collins reported the matter on the child abuse hotline, and Anita Reginelli, social worker with the Bolivar County Welfare Department, on November 18, went to Amanda's school in Cleveland and talked with Amanda. Reginelli then notified George Serio, investigator with the Cleveland *409 Police Department, who also questioned Amanda Clare. Following this Shamblin was arrested.
Amanda went to her sister's home in Drew, and following a youth court hearing, stayed in Mrs. Collins's home until March 25, 1989, when she was taken to a child abuse shelter in Greenville. On November 19, 1988, William B. Profilet, M.D., a gynecologist in Cleveland, made a physical examination of Amanda, and found her hymen intact.
On March 29, 1989, Amanda was counseled by Paul Davey, a child psychotherapist with the regional mental health center. Davey held a master's degree in counseling psychology from the University of Southern Mississippi. In June, 1989, he counseled her upon three separate occasions, totaling three and one-half hours in time spent with her.
On April 19, 1989, the grand jury of the Second Judicial District of Bolivar County indicted Shamblin on four counts of sexual assault, namely:
(1) On October 28, 1988, feloniously engaging in sexual penetration with Amanda by inserting his finger into her vagina;
(2) On the same date feloniously engaging in sexual penetration with Amanda by inserting his penis into her mouth;
(3) On November 4, 1988, feloniously, for purpose of gratifying his sexual desires, touching and rubbing Amanda with his penis;
(4) On November 1, 1988, for purpose of gratifying his sexual desires, handling and rubbing Amanda with his hands.
Trial was held June 5, 1988. Amanda testified that when she was twelve, her father rubbed his penis in her presence and asked her if she had ever seen one. She told him "no." He said, "This is my way of teaching you about sex."
In October and November, 1988, her brother Samuel, a high school student, was employed at a local grocery. Mrs. Shamblin used Friday nights to do her grocery shopping for the ensuing week, and would be gone from the house an hour or two. Amanda also testified that on the Friday nights in question, Samuel was working at the store.
She testified that on Friday night, October 28, the two were in the living room when Shamblin told her to go put on her mini-skirt without any panties. She did so, and she said, "He started rubbing on me and then he put his hand under my skirt and put his finger inside me." After this happened:
He got up and he went into the bathroom and he told me to get on my knees and when I got on my knees he put his penis in my mouth and he said to put my mouth on it as far as it would go and I started fake choking so he would stop.
(R. 76)
On the Friday nights of November 4 and 11, Shamblin's acts consisted of rubbing her on her breasts, asking her to rub his penis, and taking her into the bathroom and standing behind her and rubbing his body up against hers. Following this, he ejaculated into the commode.
Davey testified that he had in the past five years seen from 220 to 225 children who had been sexually abused, and had seen over a hundred in the past year.
On direct examination he testified:
Q. Mr. Davey, based on your expertise in the field, what characteristics are evident in a sexually abused child?
A. Children sometimes respond in different ways when they have been abused, but, generally, at the first appointment when I am seeing a child, I look for certain things in what the child tells me. I look at whether or not the child has difficulty remembering certain events over others, whether or not they have difficulty in describing sexually related material in the children's terms, whether or not the child is making a one shot statement, that kind of thing, where the child says it only happened once and it never happened again. I look for whether or not the child can talk about what happened *410 out of context. I also look for the emotional reactions of the child  do they have some emotions about what they say happened. I look at whether or not the child always has to start at the beginning when they are talking about what happened to them and whether or not there is some unfolding statements that the child makes of the time. Those are generally the things that I consider, taking the history and getting through that first appointment with the child.
Q. And are these what you consider the behavioral characteristic indicators of a child who has been sexually abused?
A. The things that I look for in those are  the child having difficulty talking about what happened, having emotional reaction, which can be depression  you can be depressed as the result of being sexually abused. I also and quite often see the kids that have been, that they have a little problem of trust, you know, they don't trust other people. They have a little problem with feelings of shame and feelings of self blame, feeling like they have done something wrong. Generally speaking, I would say that those are the characteristics that most kids have that come in.
Q. When you saw [Amanda], what, if any of these characteristics  behavioral characteristics were indicated by [Amanda]?
A. [Amanda] had difficulty initially talking about what she had experienced. She was tearful in her first session  said she was having some feelings of depression  feeling depressed about what she said had happened to her. She also said that she had a great problem being able to trust people and figuring out who she could trust as opposed to who she couldn't. She felt like she was to blame and she had a good many feelings of what had happened to her was somehow her fault, that it somehow happened because of her. I think those, basically, are characteristics that [Amanda] came in with when I saw her the first time.
Q. And are these characteristics consistent with those of an abused child?
A. Yes, they can be.
Q. And what did you say her demeanor was when she came in?
A. She was tearful and depressed and it took a while to complete our first interview, but she did manage to talk to me and tell me what had happened to her.
On cross-examination Davey was asked if some of Amanda's other problems may have caused her emotional instability, and the following testimony elicited:
A.  I would think so, yes. But what [Amanda] said was that she felt rejected by her entire family.
Q. And that would be consistent with the fact that she had kind of been moved from pillar to post for a little while?
A. Well, it's strange that that didn't come up in connection with her feeling like she had been rejected. She felt rejected because she made the statement that she had been molested.
Q. She felt rejected by all of her family members?
A. She said that she felt rejected by most of her family.
Q. What would her being rejected by her sister in Drew have anything to do with any molestation?
A. Well, I think what it had to do with is, again, her being emotionally unstable at the time and feeling like that it was very difficult for her to talk to anyone about what happened to her and wondering in the back of her mind if anyone really believed her.
... .
Q. Do you ever look into the facts of there possibly being other criteria or stimuli that could bring on some of the facts that you are hearing from this alleged victim?
A. I consider whether or not the child meets the criteria as I stated earlier, is it difficult for the child to describe what happened; does the child make a one shot statement or do they say it is more to it than that. And the other *411 things that I mentioned before I consider those criteria in determining whether or not the child is making what could be considered a valid statement and then I try and make a determination for myself as a therapist as to whether or not it is a high probability or a moderate probability or a low probability, but I am not an investigator for the court and I don't go out and talk to family members and I don't go out and try to locate someone else to 
Q.  No, I am talking about from this particular individual in this case, [Amanda]. Did you ask any questions to determine whether or not she might have been subjected to anything outside of an abuse situation that would have prompted?
A. Yes, I asked her why she told in the first place. I asked her what she wanted to happen when she told, what she thought was going to happen when she told. I asked her what motivated her to tell at the time that she did in order to determine exactly what her motivation was.
Q. Can children  and whatever your definition of children is  can children if they are subjected to outside stimuli in terms of books, magazines, adult films, can those children also relate the same history that you see in some abuse cases?
A. No.
Q. Why not?
A. According to a recent survey, a recent study  excuse me, a recent research study done by a man named David Jones, children can make statements in a response to a suggestion, but they do not provide spontaneous information and they do not provide significant detail, which is one of the other things I look for. When a child provides significant detail 
Q.  Why not, Mr. Davey?
A. Because it takes a great deal of energy to be able to support the kind of statements that most children who have been abused make. It takes some knowledge of  it takes some experience of the actual incident. You asked me a question about, in general, do children do that 
Q.  If they 
A.  according to the research, the answer is no.
Q. If they had seen a tape or seen books or magazines depicting this, you are saying that child could not testify based on what they have been subjected to, as to those set of facts?
A. One of the things that I did with [Amanda] and that I do with other children who are in treatment is ask the child to pick an anatomical drawing which the child uses to refer to, in order to talk about specifically in great detail what happened to them. I also asked [Amanda] to participate in completing a floor plan sketch of the house, which we did in one session, so that she could tell me in detail what happened, where it happened and what else was going on at the time. Those are the things that I did in the course of the treatment in order to determine whether or not a child is talking about something that happened to them or telling me something that they say on a video tape.
On re-direct examination Davey testified that a drawing was never shown to a child until the child had related what had happened, and only at a later session would anatomical drawings be shown to a child and the child asked to select the drawing which best represented what had happened to him or her. There were 32 drawings, and Amanda Clare picked a drawing that represented her case.
Davey's testimony concluded as follows:
Q. You said that one of the things that you look for  you told Mr. Atkinson  was significant detail to you as to what happened to her?
A. Yes, she was. There is just a difference in how children respond when they have the detail and they can provide it as opposed to when they can't. Let me see if I can make that a little clearer. I have seen some children who were coached. I have seen some *412 children who fabricated, but very small in number  it doesn't happen very often. But when it does those kids generally do certain things also. They generally say that it only happened one time. They have difficulty talking about it in significant detail. It seems that they always have to start at the beginning or near the beginning. They really can't respond well to questions that are asked out of context, if they are asked about something in the middle, they really have difficulty relating to that because they are talking about what someone else told them or something that they know from another source.
I have seen a little over 220 kids who have been molested and out of that entire group I have seen two out of those 220, two kids who were coached, and those kids responded from the questions, than the kids who had the detail  kids who have significant detail like [Amanda] will say that the reason they told was because they wanted it to stop. Kids who don't have a detail, maybe, they told for other reasons. The two children that I referred to when I asked them why did you tell and what do you think will happen and they said they thought they were going to get a four wheeler out of the deal.
Reginelli testified that when she questioned Amanda on November 18, she hung her head, hunched her shoulders and started crying. Serio testified that when he saw Amanda that day, she was nervous, quiet, and began crying, and was upset.
For the defense, Samuel testified that he was not working at the grocery store on the nights in question, but was at home, and that what Amanda had testified to did not happen. Mrs. Joyce Adams, a daughter to Mrs. Shamblin, testified that she had brought her children to the Shamblin home, and had no fear about leaving them around her stepfather. Mrs. Shamblin testified that Amanda was unhappy because she was overly strict in making the children keep their rooms clean, attend to their chores, and get to bed on time, and up early in the morning. Two letters were found in Amanda's dresser drawer after she left, both saying that she was leaving, but giving other reasons than sexual molestation by her father.
Shamblin testified in his own behalf, denying that he had ever committed any of the acts with which he was charged, or acted improperly in any way towards his daughter.
Shamblin sought during trial to be permitted to call Jeffrey Dale Shamblin, another older brother, and ask him: (a) whether or not he saw Amanda viewing adult films at her sister's house; (b) whether or not he heard Amanda discussing with her sister how much they were going to receive from the welfare department; and (c) whether or not he heard Mrs. Collins and another woman in Amanda's and Samuel's presence openly discussing anal and oral sex with their husbands. The circuit judge ruled the testimony as to the sexual matters was irrelevant and furthermore, even if relevant, under Rule 403 MRE would be more prejudicial than probative.
Shamblin was convicted on all four counts and has prosecuted this appeal.

LAW
Shamblin on appeal has two assignments of error, the second challenging the sufficiency of the evidence to convict, and the first that the court erred in refusing to permit him to offer testimony as to Amanda's opportunity to gain information about sexual matters other than her experience with her father.
Addressing the second assignment first, we have at length set forth the trial testimony, and find there was sufficient evidence to support Shamblin's conviction on all four counts. The weight and credibility of the witnesses was for the jury. In this case the jury had an opportunity to hear testimony from all members of the family who had any knowledge about this case, and to observe their demeanor. Mohr v. State, 584 So.2d 426, 431 (Miss. 1991); Dixon v. State, 519 So.2d 1226, 1228 (Miss. 1980); Groseclose v. State, 440 So.2d *413 297, 300 (Miss. 1983); Marr v. State, 248 Miss. 281, 159 So.2d 167 (1963).
As to the circuit court's refusal to permit testimony concerning Amanda's opportunity to gain sexual information from other sources than her father, we find no abuse of discretion. The circuit judge noted that Amanda, thirteen years of age at the time of the offenses, and fourteen at trial, was of sufficient age to learn about sexual matters from any sources, and there was nothing about her testimony showing some special or unusual precocity in such matters. In Collins v. State, 513 So.2d 877 (Miss. 1987), and Wade v. State, 583 So.2d 965 (Miss. 1991), this Court reversed convictions of defendants accused of child molestation because of the introduction of evidence showing them in possession of pornographic materials because such evidence was more prejudicial than probative. The same principle is applicable when such evidence involves a child victim. Under Rule 403, MRE, even if such evidence were relevant, its admissibility is within the discretion of the circuit judge. We will not reverse an evidentiary ruling of the trial court unless there has been a clear abuse of discretion. Johnson v. State, 567 So.2d 237, 238 (Miss. 1990); Hentz v. State, 542 So.2d 914, 917 (Miss. 1989); Ivy v. State, 522 So.2d 740, 742 (Miss. 1988).
We find no reversible error and affirm.
AFFIRMED.
ROY NOBLE LEE, C.J., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
DAN M. LEE, P.J., concurs in result only.
NOTES
[1] The names of all the children have been changed to protect the child victim.
[2] Amanda was born in 1975.