ISHEE, J.,
for the Court.
"¶ 1. William Dewayne Saveli was convicted of the murder of'Mandy Davis in the Circuit Court of Neshoba County and sentenced to life imprisonment in the Mississippi Department of Corrections (“MDOC”). Aggrieved by his sentence and conviction, Saveli now appeals. Finding no error, we affirm.
FACTS
¶ 2. Davis was last seen on Wednesday, September 10, 2003, visiting Saveli’s trailer after having dropped her car off at Saveli’s automobile repair shop (located next to his trailer) to be fixed. Davis had been acquainted with Saveli for a number of years, and she visited him regularly. Patsy Pope, Saveli’s mistress through whom he fathered a child, testified that she saw Davis at Saveli’s trailer at approximately 6:30 p.m. on September 10, 2003. Davis’s mother testified that Davis did not come home on the night of September 10, 2003. On Thursday, September 11, 2003, Davis did not show up at work at the school where she taught as a substitute. On the evening of Thursday, September 11, 2003, Saveli called Davis’s home and said that her automobile was ready to be picked up. When Davis’s mother arrived at Saveli’s automobile repair shop, Saveli told her that Davis had been there on Wednesday and left with someone else, who he did not see. On Saturday, September 13, 2003, Davis’s mother phoned the Philadelphia Police Department and reported Davis missing.
¶ 3. Also on September 13, 2003, after officers learned that Davis had last been seen with Saveli, Captain Dickie Sistrunk of the Philadelphia Police Department called Saveli and asked him to come to the police station to answer some questions concerning Davis. Saveli testified at the suppression hearing that when Sistrunk called him, he was told to “come to the police department or either they would pick [him] up.” Saveli arrived in his own vehicle. Saveli was not under arrest nor even a suspect at this time, and officers did not yet know for sure that a crime had been committed. When .Saveli first arrived, he went to the office of a police investigator, Jimmy Reid, to answer questions concerning Davis. Saveli asked to use the restroom, at which point Reid showed him the restroom and left Saveli alone. Saveli testified at the suppression hearing that when he returned from the restroom, he walked back into Reid’s office and was there for two or three minutes before Reid returned.
¶ 4. Saveli told Reid that Davis had been at his trailer on September 10, 2003 getting her automobile fixed, that she had narcotics[1] in her possession, and that she had left with someone else who he did not see. He additionally told Reid that he was awakened that night by a “popping sound,” *965 and that he went outside and saw that his truck was on fire.[2] At the time .of the interview with Reid, Saveli was wearing a splint on his hand. He stated that he had injured it breaking his truck window to get wrecker keys from inside. Reid then thanked Saveli for coming in, and Saveli left in his own vehicle. Saveli was at the police station for approximately thirty-five to forty-five minutes.
¶ 5. Police visited Saveli’s property on Sunday, September 14, 2003, and looked around with Saveli’s consent, but found nothing helpful in locating Davis. On Monday, September 15, 2003, police began looking around on the property of Ted and Patty Pope, where Saveli was known to regularly hunt. On the first trip to the Pope property, police found nothing of interest.
¶ 6. On Tuesday, September 16, 2003, police interviewed Saveli again. At this time, though Saveli was not under arrest, he was advised of his rights pursuant to Miranda v. Arizona, after which Saveli signed, dated, timed and acknowledged a waiver of those rights. At this interview, Saveli again mentioned the narcotics Davis allegedly brought to his trailer on September 10, 2003. Saveli mentioned, in connection with the burning of his truck, a person named “Iceman” that he “used to run dope for.” An officer testifying at trial stated that Saveli “was very inconsistent” in this interview and “would say one thing, but ... a sentence or two later ... contradict what he said.” Saveli said in this interview that he suspected that “Iceman” picked Davis up from his trailer on September 10, 2003, though he did not see him. After the interview, Saveli drove himself home.
¶ 7. Later in the afternoon on September 16, 2003, police received a call from Patty Pope saying Saveli had called her that day saying he had been attacked. Police arriving at the scene noted that Saveli was bleeding from both his eye and from his rib cage area. He told police that Iceman had hit him in the eye with a two-by-four and kicked him while he was on the ground. At a police interview the next day, September 17, 2003, Saveli, after again waiving his Miranda rights, stated that he was wearing his glasses when Iceman hit him, but when police questioned as to how he got hit in the eye with a two-by-four without breaking his glasses, Saveli got angry. Saveli stated that he owed Iceman money from when he ran dope for him five years previously, but Saveli could not explain why Iceman waited until five years later to attack him. Police also asked him during this interview, “if you were in our shoes, where would you look [for Davis?],” and Saveli gave them three locations: “off highway 16 up past the casino,” “old Longino Road,” and on the Pope property.
¶ 8. Also on September 17, 2003, Patty Pope went to Saveli’s property to bring him food, and noticed Saveli in a truck on top of a hill. She drove up and noticed “a bunch of blood on the ground.” She stated that Saveli told her he had taken some pills and cut his wrist. He also had a gun to his forehead. Patty stated that, when *966 she examined the cut, she noticed that it “was not really cut for the amount of blood that — that I noticed was everywhere.” Patty stated that eventually Saveli calmed down and went back to the trailer.
¶ 9. On September 18, 2003, police again went to search the Pope property, this time with the aid of a helicopter. An officer spotted something red in a pond on the property, and when investigators retrieved it, they found that it was a red fireman’s bag with black handles, partially unzipped. Through the partially unzipped opening, officers saw what appeared to be human remains. Upon opening the bag, police found two severed arms, a severed head, and a severed leg, along with blue plastic material, a glove and several bricks. The crime lab experts later determined the limbs and head to belong to Davis. Davis’s torso, with one leg attached, was found on September 19, 2003, in a nearby creek, partially burned, with nine stab wounds to the left chest area. A glove matching the one found in the red fireman’s bag was found in the area near the torso. Crime lab experts determined Davis’s cause of death to be the nine stab wounds to the chest.
¶ 10. After the bag was found, charges were filed against Saveli. When police went to arrest him, Saveli would not come out of his trailer. Members of the SWAT team arrived, forced entry to the trailer, and arrested Saveli. It was later discovered that the red bag belonged to Ted Pope and was kept in his GMC truck. Saveli had borrowed Ted Pope’s truck on Sunday, September 14, 2003, after his truck burned. Saveli’s truck was not returned until a week after the body was found, and the bag was not in the truck when it was returned. Further searches of the Pope property led officers to a brick pile, where shoe prints were observed. The shoe prints matched a pair of shoes later confiscated from Saveli’s residence. The blue vinyl material in the bag was from a children’s swimming pool cover Ted Pope had behind his house. A kaiser blade with hairs from Davis on it was found in the back of the black GMC truck.
¶ 11. Ruth Ann Smith, a neighbor of the Popes who knew Saveli well, testified at trial that she saw Saveli on September 17, 2003 on the Popes’ property. She was standing in her kitchen window, washing dishes, when she saw Saveli driving a four-wheeler out of the woods. He parked the four-wheeler at a shed, ran to the carport of the Popes’ home, and ran back to the four-wheeler carrying a red bag with black handles. He also had “something blue” that he attached to the four-wheeler. Sa-veli left for some time, and then reappeared riding the four-wheeler, at which point he retrieved “something long and shiny” from the Popes’ shed. He then went back into the woods. He reappeared a long period of time later, threw something into the Popes’ shed, and then drove the four-wheeler to the Popes’ home. Smith then saw Saveli drive away at a high speed in Ted Pope’s GMC truck.
¶ 12. On September 25, 2003, while Sa-veli was in jail, he allegedly passed word to investigators that he wanted to talk. Sa-veli contended at trial, however, that he never said he wanted to talk to anyone. At any rate, an investigator subsequently went to get him and took him outside to smoke a cigarette. Saveli told the investigator that he would tell him everything he needed to know, and the investigator took Saveli back into the jail, where he advised him of his Miranda rights. Saveli waived them. Saveli then admitted to killing Davis, but he claimed it was an accident. He claimed that he, Davis and Iceman were at a shack in the woods where Davis allegedly hid narcotics. He said that she retrieved the narcotics, but then got into *967 an argument with Iceman about them. Saveli claimed .that he then hit Davis “up side her head” to get her to be quiet, causing her knees to buckle, after which she fell to the ground face forward. He stated that, when he turned her over, he knew he had killed her. Saveli claimed that he and Iceman then tried to put the body in an old well, but were unsuccessful, so buried her in- a shallow grave. The following day, he put the body in a “Dive Team” bag to keep it together. Iceman’s brother, Bradley, supposedly was to dispose of the body. Police then went to the site mentioned by Saveli and found the bag and shallow grave. Saveli subsequently signed a more in-depth confession.
¶ 13. In the in-depth confession, Saveli claimed that, on September 15, 2003, he took Bradley out to the Pope property and showed him “a way to go behind Patty’s to get Mandy’s body so no one would see him.” Saveli stated that he then gave Bradley a red fire department bag he took out of Ted Pope’s truck.
¶ 14. At the conclusion of the State’s evidence, Saveli offered no evidence. Sa-veli was convicted of murder in the Circuit Court of Neshoba County, and sentenced to life imprisonment in the custody of the MDOC. Aggrieved by his conviction and sentence, Saveli appeals, asserting the following: (1) that the trial court erred by failing to suppress his first statement to police; (2) that the trial court erred by overruling his hearsay objection; (3) that the trial court erred by admitting into evidence two photographs of the fireman’s bag containing the body parts, exhibits 37 and 38; (4) that the trial court erred by overruling his objection to admissibility into evidence of a pair of tennis shoes seized from his home; (5) that the trial court erred in sustaining the objection of the prosecutor to Saveli’s cross-examination of Patty Pope; and (6) that the trial court erred by admitting into evidence Sa-veli’s confession.
STANDARD OF REVIEW
¶ 15. “Relevancy and admissibility of evidence are largely within the discretion of the trial court, and reversal may be had only where that discretion has been abused.” Price v. State, 898 So.2d 641, 653(¶ 29) (Miss.2005) (quoting White v. State, 742 So.2d 1126, 1134(¶ 29) (Miss.1999)). The trial court must exercise its discretion within the scope Mississippi Rules of Evidence, and we will reverse only when an abuse of discretion prejudicing the accused occurs. Id.
ISSUES AND ANALYSIS
I. Whether the trial court erred by failing to suppress Saveli’s first statement.
¶ 16. Saveli contends that the trial court erred by failing to suppress his first statement to police because police failed to advis.e him of his Miranda rights before he made the statement. A defendant seeking to overturn a trial court’s unfavorable ruling on a motion to suppress “bears a heavy burden.” Sanders v. State, 835 So.2d 45, 50(¶ 15) (2003) (citing Hunt v. State, 687 So.2d 1154, 1160 (Miss.1996)). “‘Where, on conflicting evidence, the lower court admits a statement into evidence, this Court generally must affirm.’ ” Sanders, 835 So.2d at 50(¶ 15) (quoting Dancer v. State, 721 So.2d 583, 587(¶18) (Miss.1998)).
¶ 17. In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that “the prosecution may not use statements, whether exculpatory or incul-patory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards *968 effective to secure the privilege against self-incrimination.” Miranda, 384 U.S. at 444, 86 S.Ct. 1602; see also Manix v. State, 895 So.2d 167, 180(¶ 38) (Miss.2005) (citing Tolbert v. State, 511 So.2d 1368, 1374 (Miss.1987) (outlining application of Miranda in Mississippi)). Such custodial interrogation must “be preceded by advising the defendant that he has the right to remain silent and the right to the presence of an attorney.” Miranda, 384 U.S. at 479, 86 S.Ct. 1602; Balfour v. State, 598 So.2d 731, 742 (Miss.1992). “Custodial interrogation” has been defined as “questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” Miranda, 384 U.S. at 458, 86 S.Ct. 1602. The custody test for Miranda purposes has been described as follows:
“Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players’ lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.”
Yarborough v. Alvarado, 541 U.S. 652, 663, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (quoting Thompson v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)). “Any noncustodial statement given freely and voluntarily without coercion requires no Miranda warning for admissibility.” Tolbert, 511 So.2d at 1375 (citations omitted).
¶ 18. Saveli testified at the suppression hearing that he came to the police department on September 13, 2003, at the behest of Sistrunk because Sistrunk told him that if he did not come, officers would come to “pick him up.” This testimony was never corroborated by either Sistrunk or Reid. Further, even if such language was used by Sistrunk, it was ambiguous, as officers knew Saveli’s truck had burned in the early morning hours of September 11, 2003. Saveli drove himself to the police station. He further testified that he knew officers just wanted to question him concerning Davis’s whereabouts. Officers at the time did not yet know that a crime had been committed. Once at the police station, Saveli went back to Reid’s office, then asked if he could use the restroom. Reid pointed out the restroom to Saveli, and then went elsewhere in the station, leaving Saveli unattended. Further, when Saveli returned to Reid’s office from the restroom, Reid did not return to the office for two to three minutes, again leaving Saveli unattended. The interview lasted approximately thirty-five to forty-five minutes, after which Saveli left in his own vehicle. Beyond Saveli’s uncorroborated testimony concerning his initial conversation with Sistrunk, there was no evidence of any threats, promises or coercion either before or during the entire course of the interview.
¶ 19. Given the totality of the above circumstances, we hold that a reasonable person in Saveli’s position would not have felt that his freedom of movement was restrained anywhere near the degree associated with a formal arrest. Quite to the contrary, he arrived in his own vehicle, was significantly unsupervised while at the station, and left in his own vehicle less than an hour after he arrived. Saveli was not in custody within the meaning of Miranda, and the statement was freely and voluntarily given. Therefore, Miranda warnings were entirely unnecessary in this situation. Saveli has thus failed to meet *969 the heavy burden necessary for him to overcome in order for us to reverse the trial court’s overruling of his motion to suppress.
II. Whether the trial court erred in overruling Saveli’s hearsay objection.
¶20. Saveli next objects to the trial judge’s overruling his objection to hearsay in the following exchange, which took place during the direct examination of Reid by the prosecution:
Q. Okay. Now I believe you also looked on the property of Ted and Patty Pope to see if you could turn up anything?
A. At which point?
Q. This would have been — uli—early on — uh—probably on the weekend or shortly thereafter.
A. I — on Monday, I rode a four-wheeler — uh—from the back of Burnside Park — uh—back up to the railroad tracks. Uh — they come out on — I think it’s 571 maybe for the Burnside Road — uh—I never did — we— we were on which I think would be the east side of the railroad tracks and went out to the road and come back, but I — and that borders the Pope property. Uh — -we were in the area, yes, sir.
Q. Did you find anything then that— that helped you?
A. No, sir, not at that time.
Q. Why — why were you looking out there?
A. We were just trying to determine any — any place that she might could be. Uh — information had been received that [Saveli] had hunted on the Pope property — uh—and that Patty Pope and him knew each other and it — they had hunted on that property.
BY [COUNSEL FOR SAVELL]: Your Honor, this — this would have to be hearsay testimony that is offered at this point, your Honor. He’s not laid any predicate for how he knows the knowledge and I object to this testimony.
BY THE COURT: Overruled.
¶ 21. Rule 801(c) of the Mississippi Rules of Evidence defines hearsay: “ ‘Hearsay is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted.” See Swindle v. State, 502 So.2d 652, 658 (Miss.1987) (“To constitute hearsay, extrajudicial words must by some means present a statement, declaration, or assertion introduced for the purpose of proving the truth of the matter contained in or asserted by the item or thing”). Mississippi Rule of Evidence 802 holds that hearsay is inadmissible, except as provided by law. Logically, when a statement is not offered into evidence to prove the truth of its subject matter, it does not fit the definition of hearsay, and may not be excluded from evidence under Rule 802. See Thorson v. State, 895 So.2d 85, 126(¶ 95) (Miss.2004) (citing Knight v. State, 601 So.2d 408, 406 (Miss.1992)). For example, a statement is not hearsay if “offered merely to show its effect on someone.” Id. In Butler v. State, 758 So.2d 1063, 1065(¶ 9) (Miss.2000), the defendant objected to the following statement by an officer as hearsay:
Q. And did you [Officer Jackson] determine as to what happened there that night?
A. Yes, Sir. Mr. Boyte had explained that as he came out to his truck, someone had jumped him, grabbed the money bag, and they got in a tussle. And he went down to the ground, was still hanging on to the money bag. And at some point he *970 was hit. He said he looked around to try to get his head in a different location and he was struck again. At that point he turned the money bag loose and two subjects ran away.
The supreme court in Butler explained: “[T]he out of court statement ... was not admitted for the purpose of proving the truth of the assertion made, but to explain the steps taken by Officer Jackson to investigate the incident. The truth of the statement ... was not in issue.” Id.; see id. at (¶ 10) (discussing holding in Swindle that officer’s testimony about informant tip was admissible to show why officer “acted as he did and was at a particular place at a particular time”).
¶ 22. In the case sub judice, Reid testified that “information had been received that [Saveli] had hunted on the Pope property — uh—and that Patty Pope and him knew each other and it — they had hunted on that property.” He gave this testimony in response to the prosecutor questioning him as to why he searched the Pope property. Clearly, the purpose of the offer of the out-of-court statement in this instance was to show the effect on the officer, i.e., why Reid “acted as he did and was at a particular place at a particular time.” The matter was not asserted for its truth, and therefore not hearsay. This assignment of error is clearly without merit.
III. Whether the trial court erred by admitting into evidence exhibits 37 and 38.
¶ 23. Saveli next contends that the admission into evidence of exhibits 37 and 38, photographs of the red fireman’s bag containing Davis’s limbs and head, was erroneous. He asserts that the prejudicial effect of these photographs on the jury far outweighed their probative value, and that the trial judge should have consequently excluded them. In support of his argument, Saveli cites Rule 403 of the Mississippi Rules of Evidence, which states, “Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence.”
¶ 24. “It is well settled in this state that the admission of photographs is a matter left to the sound discretion of the trial judge and that his decision favoring admissibility will not be disturbed absent a clear abuse of that judicial discretion.” Noe v. State, 616 So.2d 298, 303 (Miss.1993) (citing Gardner v. State, 573 So.2d 716, 718-19 (Miss.1990); Sudduth v. State, 562 So.2d 67, 69-70 (Miss.1990)). The discretion of the trial judge in this matter is almost unlimited, “regardless of the gruesomeness, repetitiveness, and the extenuation of probative value.” Id. (quoting Williams v. State, 544 So.2d 782, 785 (Miss.1987)). So long as a photograph has probative value and serves a meaningful evidentiary purpose, it may still be admissible despite being gruesome, grisly or inflammatory. Id. (citations omitted). The trial judge’s discretion, however, while “almost unlimited,” is not completely unfettered. Id. However, it has been noted by the Mississippi Supreme Court that “photographs have been held ‘to be so gruesome and inflammatory as to be prejudicial in only one circumstance, close-up photograph of a partly decomposed, maggot-infested skull.’ ” Taylor v. State, 672 So.2d 1246, 1270-71 (Miss.1996) (noting solitary instance of photographs being held prejudicial in McNeal v. State, 551 So.2d 151 (Miss.1989)).
¶ 25. “Photographs are considered to have evidentiary value in the following instances: ‘(1) aid in describing the *971 circumstances of the killing; (2) describe the location of the body and the cause of death; (3) supplement or [clarify] witness testimony.’ ” McIntosh v. State, 917 So.2d 78, 83-84(¶ 13) (Miss.2005) (quoting Spann v. State, 771 So.2d 883, 895(¶31) (Miss.2000)).
¶ 26. In the case sub judice, the complained of photographs are quite gruesome. However, so too was the manner in which Davis’s body was hidden. The photographs serve both to show the location of the remains and to supplement witness testimony concerning the location of the remains, as well as the state in which they were discovered. Furthermore, we do not find the photographs so repetitive as to lose their probative value, as the angles and details emphasized by each photograph are distinct. Thus, the photographs were of obvious probative value, and the trial judge correctly so held. The trial judge clearly considered the potential danger of prejudice, but found it outweighed by the probative value of the photographs. He thoroughly discussed the photographs with counsel for both sides concerning why the photographs were being offered into evidence prior to making his ruling. Accordingly, we cannot say that the trial judge abused his broad discretion concerning the admission of the photographs, exhibits 37 and 38. This assignment of error is without merit.
IV. Whether the trial court erred in overruling Saveli’s objection to admissibility into evidence of the pair of tennis shoes and denying Saveli’s motion to suppress them.
¶ 27. Saveli argues that the trial court erred by admitting into evidence a pair of tennis shoes seized from his home which matched shoe prints found at a location related to the crime. He asserts that, though the search warrant pursuant to which police searched his home authorized the seizure of shoes, nothing in the affidavit or underlying facts and circumstances supporting the warrant supported seizure of shoes. Saveli thus contends that his Fourth Amendment rights against unreasonable search and seizure were violated due to this lack of probable cause.[3]
¶ 28. The United States Supreme Court has established a “totality of the circumstances” standard for the determination of the existence of probable cause for the issuance of a warrant. Illinois v. Gates, 462 U.S. 213, 233, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); see Lee v. State, 435 So.2d 674, 676 (Miss.1983) (adopting “totality of the circumstances” standard in Mississippi). This simply requires a magistrate to “make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the ‘veracity’ and ‘basis of knowledge’ of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.” Gates, 462 U.S. at 238, 103 S.Ct. 2317. “[Reviewing a magistrate’s issuance of a search warrant on appeal does not require that we make a de novo determination of probable cause; therefore, our standard of review is to determine whether there was a substantial basis for the magistrate finding probable cause.” Pittman v. State, 904 So.2d 1185, 1189(¶ 4) (Miss.Ct.App.2004) (citing Smith v. State, 504 So.2d 1194, 1196 (Miss.1987)).
*972 ¶ 29. Sistrunk and Officer Danny Knight, after finding the remains of Davis in the red fireman’s bag on the Pope property, presented the judge issuing the warrant with an affidavit stating that they had good reason to believe that things such as a “Kaiser blade, ax, hachet(s) [sic], chain saws ... boots, shoes, clothes, gloves and other instrumentalities used in the Mom-mission of a crime” could be found in or on Saveli’s home and property. The underlying facts supporting the belief that such things could be found on Saveli’s property included, inter alia, the following: Davis had last been seen at Saveli’s property; Saveli had given inconsistent statements to police; there was an intentional fire set in Saveli’s truck on September 11, 2003; Davis’s remains had been found in a red fireman’s bag previously known to have been carried in the vehicle Saveli was driving at the time; police received information from “a close personal friend” that Saveli told her where the body might be located; and, Saveli “would and does have access to the area where the human remains were found.” We find these facts to be more than ample to support seizure from Saveli’s residence of the pair of tennis shoes. When police search a premises pursuant to a warrant in a murder investigation, clothing and shoes of a suspect are items typically searched for because of the importance of DNA, tissue and fiber analysis, as well as other evidentiary purposes. Therefore, it is clear that the magistrate in the case sub judice had a substantial basis for finding probable cause to issue a search warrant listing shoes among the items to be searched for and seized. This assignment of error is thus without merit.
V. Whether the trial court erred in sustaining the objection of the prosecutor to Saveli’s cross-examination of Patty Pope.
¶ 30. Saveli contends that the trial judge erred in sustaining the prosecution’s objection in the following exchange during Saveli’s cross-examination of Pope:
Q. Monday, September twenty-second, you were the — you were — uh—interviewed by Dickie Sistrunk and Officer Knight, weren’t you?
A. If that was the paperwork date.
Q. Then the next day on the twenty-third, they took you to Jackson for an interview didn’t they?
BY [PROSECUTION]: Your Honor, I’ve got an objection.
BY THE COURT: Sustained.
BY [COUNSEL FOR SAVELL]: Your Honor, is the' Court ruling that she can’t answer if she was the subject of an interview in Jackson?
BY THE COURT: I think I know what you’re going into—
BY [COUNSEL FOR SAVELL]: Your Honor, I’m not going any further than that.
BY THE COURT: I sustain the objection.
[COUNSEL FOR SAVELL] CONTINUES:
Q. Were you interviewed the next day on Tuesday? You said you interviewed on Monday, were you interviewed again on Tuesday?
A. Yes, sir, if there’s paperwork on that date I was.
Q. That didn’t occur in Philadelphia, did it?
BY [PROSECUTION]: Objection, your Honor?
BY THE COURT: Sustained.
Saveli presents no argument as to this issue aside from citing a passage from a case explaining the importance of cross-examination as an evidentiary tool. See Patrick v. State, 285 So.2d 165, 167 (Miss.1973) (quoting Prewitt v. State, 156 Miss. *973 731, 735, 126 So. 824, 825 (1930)). He fails utterly to direct our attention to how the trial judge’s ruling constituted an abuse of discretion or resulted in prejudice to him. We see nothing in the record to indicate that the trial judge abused his discretion in sustaining the prosecution’s objections in the above exchange, and we see no prejudice to Saveli even if the trial judge’s discretion were abused. Accordingly, this assignment of error is without merit.
VI. Whether the trial court erred in admitting into evidence Saveli’s confession.
¶ 31. Saveli contends that his confession on September 25, 2003, was taken at a time after he had requested appointment of counsel. He contends that he requested counsel both at his initial appearance and on other occasions. Saveli further argues that, though the investigator who took his confession testified at the suppression hearing that jailers had informed him that Saveli wanted to see him, the investigator’s notes and reports did not reflect this. Saveli thus argues that his right to counsel was violated by officer-initiated interrogation and that the confession should have been suppressed as a result.
¶ 32. An accused’s Sixth Amendment right to counsel accrues once the accused is in custody. Brink v. State, 888 So.2d 437, 447(¶28) (Miss.Ct.App.2004) (citing Balfour v. State, 598 So.2d 731, 743 (Miss.1992)). “Specifically, the right attaches at the point in time when the initial appearance ought to have been held.” Brink, 888 So.2d at 447(¶ 28) (citing McGilberry v. State, 741 So.2d 894, 904(¶ 17) (Miss.1999)). Once the accused asserts the right to an attorney, the right attaches and “any statements obtained from the accused during subsequent police-initiated custodial questioning regarding the charge at issue (even if the accused purports to waive his rights) are inadmissible.” Balfour, 598 So.2d at 742 (quoting McNeil v. Wisconsin, 501 U.S. 171, 179, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)). “[A]n accused, having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.” Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (emphasis added). “Although a defendant may sometimes later regret his decision to speak with police, the Sixth Amendment does not disable a criminal defendant from exercising his free will.” Michigan v. Harvey, 494 U.S. 344, 353, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990)
¶ 33. In reviewing a trial court’s denial of a motion to suppress a confession, “we apply the familiar general rule that since the trial court sits as the fact-finder when determining the issue of whether an accused’s confession has been intelligently, knowingly and voluntarily given, we will only reverse the trial court’s determination of this issue when such determination is manifestly wrong.” Glasper v. State, 914 So.2d 708, 716(¶21) (Miss.2005). In order for us to reverse a trial court’s determination on admissibility into evidence of a confession, the trial court must have committed manifest error, applied an incorrect legal standard, or rendered a decision contrary to the overwhelming weight of the evidence. Id. at 716-17 (citations omitted). Further, “there is no doubt that a confession is only admissible after the State has proven beyond a reasonable doubt that the accused’s confession was not the product of promises, threats or inducements.” Id. at 717 (citations omitted).
*974 ¶ 34. In the case sub judice, the trial judge found that the confession was admissible after hearing testimony both from the officer taking the confession and from Saveli. The trial judge heard conflicting accounts from the officer and Saveli as to whether Saveli initiated the confession, and found the officer’s testimony to be more credible. The record shows evidence that Saveli initiated the contact, signed a waiver, and gave a confession. There is no evidence in the record of promises, threats or coercion leading to the confession. The trial judge was thus satisfied that the confession was knowing, intelligent and voluntary. Further, Saveli’s argument that the confession “in no way comported with the autopsy report of death by nine stab wounds to the chest” does not bar the admissibility of the confession. Therefore, we find nothing indicating to us that the trial judge manifestly erred, applied an incorrect legal standard, or made a decision contrary to overwhelming weight of the evidence. This assignment of error is without merit.
¶ 35. THE JUDGMENT OF THE CIRCUIT COURT OF NESHOBA COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTION IS AFFIRMED. ALL COST OF THIS APPEAL ARE ASSESSED TO NESHOBA COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, GRIFFIS, BARNES AND ROBERTS, JJ., CONCUR.

. Saveli told Reid that Davis had a bag of "ice" (a form of methamphetamine) that she was looking to sell, and that he estimated its value at approximately $400.

. An investigator was sent to Saveli's property to investigate reports of a fire in the early morning hours of September 11, 2003. Sa-veli told the investigator that he came outside and saw his truck on fire, burst the window to get some wrecker keys, and used a wrecker to push the burning truck away from his trailer. The investigator saw no skid marks, however. Additionally, the investigator determined that the' fire had been man-made, as traces of accelerants were present. The investigator further determined that the passenger door was open during the blaze, thus discounting Saveli’s claims that he had to break a window.

. The Fourth Amendment to the United States Constitution states, “The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.” U.S. Const, amend. IV.