# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-01235-COA

ANDREW GRAHAM WINSTEAD                                      APPELLANT

v.

STATE OF MISSISSIPPI                                                APPELLEE

DATE OF JUDGMENT:            11/17/2022
TRIAL JUDGE:                 HON. CALEB ELIAS MAY
COURT FROM WHICH APPEALED:   NESHOBA COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:      CHRISTOPHER A. COLLINS
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                             BY: DANIELLE LOVE BURKS
DISTRICT ATTORNEY:           STEVEN SIMEON KILGORE
NATURE OF THE CASE:          CRIMINAL - FELONY
DISPOSITION:                 AFFIRMED - 05/07/2024
MOTION FOR REHEARING FILED:

### BEFORE WILSON, P.J., McCARTY AND EMFINGER, JJ.

### WILSON, P.J., FOR THE COURT:

¶1.     Andrew Winstead left the scene of an accident after the truck he was driving struck and killed a toddler. Winstead was arrested later that night and eventually confessed. Winstead was indicted for leaving the scene of an accident resulting in death. At trial, he objected to the admission of his recorded confession, arguing that it was obtained in violation of his right to counsel, which he had asserted. Winstead also objected to the admission of a bloodstain card that contained a blood sample obtained during the victim's autopsy, which an analyst compared to blood found on Winstead's truck. The trial court overruled both objections, and the jury found Winstead guilty. The trial court sentenced Winstead to twelve years in the custody of the Department of Corrections, with five years suspended, seven years

to serve, and five years of post-release supervision.

¶2. On appeal, Winstead argues the trial court erred in admitting his confession and the bloodstain card. We conclude that Winstead's confession should have been excluded because it was obtained in violation of *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). However, we also conclude that the error was harmless in light of the overwhelming evidence of Winstead's guilt. In addition, the trial court did not err by admitting the bloodstain card. Accordingly, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶3. On April 29, 2021, two-year-old Nolan Norris was struck and killed by a pickup truck on Highway 492 in front of his home near Union, Mississippi. The truck's driver, Winstead, was later indicted under Mississippi Code Annotated section 63-3-401 (Rev. 2022) for leaving the scene of an accident resulting in death. A jury trial was held in November 2022.

¶4. Nolan's mother, Madison Norris, testified that prior to the accident, her three children, her mother, her sister-in-law Cassie Clearman, and Cassie's child were all at Madison's house. As the children were playing, Madison realized that Nolan was not inside the house. She ran to her front door and saw Nolan standing on the other side of Highway 492. Madison started running toward Nolan, and Nolan turned and saw her. Nolan then stepped into the road and was immediately struck by a pickup truck traveling west toward Union. Madison testified that Nolan was struck at 8:28 p.m. The truck continued down the road. Madison "immediately picked up [Nolan] out of the road" and carried him to her yard, but she could tell that he was dead.

2

¶5.     After Madison carried Nolan into her yard, the truck—"a dark colored truck" pulling a golf cart on a trailer—returned to the scene and stopped "[r]ight in front of [Madison's] driveway." Madison testified, "[The driver] got out of the truck and came over there, and he said, 'Oh, my God. Damn.' And he got back in his truck and kept going," traveling east toward House, Mississippi. At trial, Madison identified Winstead as the driver.[1] Madison testified that her neighbor, Ralin Williams, was nearby when Winstead approached her, but Cassie had walked back toward the house to keep the other kids away from the scene.

¶6.     Cassie testified that after she and Madison realized Nolan was not inside the house, they ran outside to look for him. Cassie testified,

> [Nolan] was at the end of the driveway, and we ran as fast as we could to get to him. And when we got to the road, we realized that there was a vehicle coming. And we waved and yelled, and he never touched the brakes. And the last thing—he just hit Nolan.

Cassie testified that the truck "just left; it kept going." Cassie then called 911, but she was too upset to talk, so she handed the phone to Williams, who came outside to help after hearing the commotion in the aftermath of the accident. Cassie testified that she was "back and forth" between the house and the road following the accident, and she did not see the truck or its driver again that night.

¶7.     Williams testified that he was watching television inside his house when he "heard some screams outside." When he walked outside, Madison was holding Nolan and was "screaming" and clearly "upset." Williams took Cassie's phone and talked to the 911

---

[1] Madison testified that she knew who Winstead was before the accident because her husband and Winstead "went to school together" and "were friends on Facebook."

3

dispatcher because Cassie was too upset to talk. Williams testified that a man driving "a Chevrolet truck [with] a trailer and golf cart" had stopped at the scene. The man was standing near Madison—"[f]ace to face"—and Williams heard them talking. But Williams did not recognize the man, nor could he hear what the man or Madison said to one another. At trial, Williams stated that he would not be able to identify the man if he saw him. The man returned to his truck and drove away before law enforcement arrived.

¶8. Officer Steve Robinson of the Union Police Department was the first law enforcement officer on the scene. Robinson lived only "two houses down" on Highway 492. Williams called Robinson around 8:30 p.m., and he responded immediately. When Robinson arrived, it was evident that Nolan was dead. After he spoke to witnesses, Robinson issued a "be on the lookout" (BOLO) for a pick-up truck pulling a golf cart. Robinson then called Lieutenant Brad Edmondson of the Mississippi Bureau of Investigation (MBI) for assistance.

¶9. When Edmondson arrived at the scene, he found a piece of a vehicle's grille in a ditch on the westbound side of the road. He thought the debris might have come from the truck that struck Nolan. While still at the scene, Edmondson learned that a truck matching the BOLO description had been stopped. At Edmondson's direction, the truck was impounded, and the driver was detained. Edmondson later examined the truck and determined that the debris found at the scene matched a piece missing from the truck's grille.

¶10. Investigator Mark Flake of the Neshoba County Sheriff's Department testified that he received a BOLO around 8:48 p.m. for a "blue Chevrolet truck pulling a trailer hauling a golf cart." A few minutes later, Flake saw a maroon Chevrolet truck pulling a trailer with

4

a golf cart. The truck was traveling north on Highway 19 near House. Flake testified that the dark-colored truck was close enough to the description in the BOLO for him to "initiate[] an investigative stop." Flake stopped the truck around 9:05 p.m. and identified Winstead as the driver. Flake asked Winstead whether he had been driving on Highway 492, and Winstead said that he had. Winstead then stated, "Honestly, I thought I hit a dog." Flake testified that Winstead also "stated that he turned around; went back; and saw someone pick something off the road and [then] left the scene."[2] Flake observed front-end damage to the grille of Winstead's truck and arrested Winstead.

¶11. Winstead was taken to the Neshoba County Sheriff's Department, where Edmondson and Trooper Thomas Carpenter of the Mississippi Highway Patrol interviewed him. Edmondson recorded the interview, which began at approximately 12:43 a.m. on Friday, April 30, 2021.[3] Edmondson advised Winstead of his *Miranda*[4] rights, and Winstead signed a *Miranda* waiver. Winstead stated that on April 29, he had played golf during the day before grilling, eating dinner, and drinking "a couple of beers" at a friend's house. Winstead said that while driving home after dinner on Highway 492, he "thought [he] hit a dog." Winstead stated that he turned his truck around, drove back, and saw "people walking back into their yard." Winstead said he continued driving and did not stop because he still

---

[2] The trial court denied Winstead's pretrial motion to suppress his roadside statements to Flake. Winstead does not challenge that ruling on appeal.

[3] The initial recorded portion of the interview lasted twelve minutes and fifty-four seconds. Edmondson noted at the end of the initial interview that the time was 12:56 a.m.

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

5

believed he had hit a dog, and he "didn't want to stop and stir no shit up." Edmondson asked Winstead for the name of the friend he had eaten dinner with, but Winstead did not want to disclose his friend's name. Edmondson insisted he needed to talk to the friend to corroborate Winstead's statements. Winstead then stated, "Can I talk to a lawyer about that? I don't have one. Like I don't know of one to talk to. But I need to talk to a lawyer first." Edmondson stopped recording the interview in response to Winstead's request for a lawyer.

¶12. About twelve minutes later, Edmondson resumed recording the interview.[5] When the recording resumed, Edmondson stated that during the twelve-minute period that was not recorded, he had explained to Winstead that he could ask to continue talking to Edmondson at any time, although he had a right to an attorney and the right to remain silent. Edmondson stated—and Winstead confirmed—that Winstead then "stated that [he] would talk to [Edmondson and Carpenter] now without [his] lawyer." Edmondson then re-advised Winstead of his *Miranda* rights, Winstead signed another *Miranda* waiver, and Edmondson resumed questioning Winstead.

¶13. During the second recorded portion of the interview, Winstead again stated that he initially thought he hit a dog, turned around and returned to the scene, stopped, and exited his truck. However, Winstead now admitted that when he returned to the scene, he realized he had hit a child—he saw a crying woman holding the child and a lot of blood. Winstead said he panicked, got back in his truck, and left. Winstead stated that he never saw the child

---

[5] The second recorded portion of the interview lasted seventeen minutes. At the end of the interview, Edmondson noted that the time was 1:25 a.m. Thus, the second recorded portion of the interview began at approximately 1:08 a.m. As noted above, Edmondson had stopped recording the first portion of the interview at 12:56 a.m.

6

step in front of his truck; he only "saw somewhat of a little blur" just before impact and thought it was a dog. Although Winstead had a cooler of beer in his truck, he denied that he fled the accident scene because he had been drinking. Winstead said he drank four beers while playing golf between noon and 3:45 p.m. He said he drank three beers while grilling and eating dinner at his friend's house between approximately 6 p.m. and 8 p.m.

¶14. Outside the presence of the jury, the trial court held a hearing on the admissibility of the second recorded portion of the interview. Edmondson, Carpenter, and Winstead testified during the suppression hearing. Edmondson said that after Winstead asked for a lawyer, he stopped "asking [him] questions" and got him something to drink. Winstead also took a restroom break.[6] According to Edmondson, "We just kind of talked[,] and [I] told him that, I mean, it's in his best interest to speak. But, you know, it is what it is." Edmondson testified that the interview resumed when Winstead said, "I'll talk to you." Edmondson and Carpenter both denied that they threatened or coerced Winstead or promised him any reward, benefit, or leniency.

¶15. In contrast, Winstead claimed that during the unrecorded part of the interview, Edmondson leaned in close to him, cursed him, and threatened him. Winstead claimed that Edmondson told him about a similar case in which a defendant "got a lawyer" instead of making a statement and "served time because the lawyer was just out looking for a check." According to Winstead, Edmondson reinitiated the interview. Winstead testified that he

---

[6] Carpenter and Winstead both testified that Winstead briefly went to the restroom, which was nearby. Edmondson could not recall whether Winstead went to the restroom. Otherwise, Carpenter's testimony was generally consistent with Edmondson's testimony.

7

agreed to continue the interview only because he "was scared and felt threatened."

¶16. Over Winstead's objection, the trial court ruled that both recorded portions of the interview were admissible. The court found that Winstead reinitiated the interview after invoking his right to counsel. The court also found that Edmondson and Carpenter did not threaten Winstead or coerce his confession. As a result, both recordings were admitted into evidence and played for the jury.

¶17. Winstead told Edmondson that he had not made any phone calls following the accident. However, Edmondson obtained a search warrant for Winstead's phone and found an outgoing call to Chuck Fox at 8:59 p.m., which was about six minutes before Flake stopped Winstead's truck. Fox owned an auto body repair shop. Fox knew Winstead and testified that he received a call from him on the night of the accident. Fox testified, "[Winstead] just said he had some damage on the front of his truck. He thought he hit a deer or dog or something. . . . [H]e didn't want his mom and dad to know."

¶18. Ty Parker, a forensic scientist with MBI, testified that she processed Winstead's truck. Parker noted damage to the front of the truck and an area of suspected blood on the front grille and the trailer stand. Parker testified that "three boxes of suspected blood" were taken from the vehicle and signed over to Edmondson. Parker also noted a contact impression on the front of the bumper, where it was believed the truck hit Nolan.

¶19. Nathan Holly, a DNA analyst at the Mississippi Forensics Laboratory, testified as an expert in forensic DNA analysis. Holly identified "a bloodstain card that was submitted to

8

the lab from the medical examiner's office."[7] The card contained blood samples obtained during Nolan's autopsy. Holly stated that the medical examiner's office frequently submits bloodstain cards to the forensics laboratory "in the normal course of their procedure." He further stated that the bloodstain card identified in court was in the same condition as it was when he resealed it at the lab. Defense counsel objected to the bloodstain card based on "chain of custody" and the "Confrontation Clause."

¶20. During a suppression hearing held outside the jury's presence, Holly testified that the forensics laboratory maintained an electronic chain of custody record for the bloodstain card, but the record did not contain information about how the medical examiner's office initially collected the evidence. Holly stated that "to [his] knowledge" and based on his review of the records, he was not aware of any "issue with the chain of custody" for the bloodstain card. The trial court overruled Winstead's objections to the card, finding no evidence of any "tampering or chain of custody issue" and sufficient evidence for "a reasonable juror [to] find [the evidence] authentic."

¶21. Holly then testified that DNA analysis showed that the blood swabbed from Winstead's truck and the blood samples taken from Nolan belonged to the same person "unless there was an identical twin."

¶22. After the State rested its case-in-chief, Winstead called Benny Cherry as a witness. Cherry testified that he was driving on Highway 492 around 5:30 p.m. on the day of the accident when a child ran into the road in front of his truck from what he believed to be the

---

[7] Both the State Medical Examiner and the Forensics Laboratory are divisions of the Mississippi Department of Public Safety.

9

Norrises' front yard. After he heard about Nolan's death, he looked at Madison's Facebook page, and he thought the child was Nolan's sister. Cherry further testified that two women were present when he saw the little girl run into the road and that one of the women retrieved the girl from the road without any "great sense of urgency." Cherry could not positively identify the woman as Madison. Cherry's testimony was supposed to impeach Madison and Cassie's testimony that none of the children had been in the road earlier in the day.

¶23. The jury found Winstead guilty of leaving the scene of an accident resulting in death. The court sentenced him to twelve years in the custody of the Department of Corrections, with five years suspended, seven years to serve, and five years of post-release supervision. Winstead filed a motion for a new trial, which was denied, and a notice of appeal.

**ANALYSIS**

¶24. On appeal, Winstead argues the trial court (1) erred by denying his motion to suppress the second recorded portion of his interview because he had invoked the right to counsel, the interview resumed without a "cooling off period," and his confession was coerced; and (2) violated his rights under the Confrontation Clause by allowing Holly to testify about a bloodstain card that Holly did not collect or test.

**I.     Winstead's Confession**

¶25. "[S]ince the trial court sits as the fact-finder when determining the issue of whether an accused's confession has been intelligently, knowingly and voluntarily given, we will only reverse the trial court's determination of this issue when such determination is manifestly wrong." *Glasper v. State*, 914 So. 2d 708, 716 (¶21) (Miss. 2005). "[W]e will not disturb

the trial court's determination on the admissibility of a confession unless the trial court applied an incorrect legal standard, committed manifest error, or rendered a decision which was contrary to the overwhelming weight of the evidence." *Id.* "Additionally, there is no doubt that a confession is admissible only after the State has proven beyond a reasonable doubt that the accused's confession was voluntary by showing that such confession was not the product of promises, threats or inducements." *Id.* at 717 (¶21).

¶26. In the "setting of in-custody interrogation," if the accused "states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda*, 384 U.S. at 474. In *Edwards v. Arizona*, 451 U.S. 477 (1981), the United States Supreme Court held that once an accused has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484-85. "In other words, once an accused has invoked his right to counsel, any statements given by the defendant in response to further police questioning are admissible only where (1) the defendant initiated further discussions with the police and (2) knowingly and intelligently waived the rights he had invoked." *Haynes v. State*, 934 So. 2d 983, 988 (¶17) (Miss. 2006).

¶27. "*Edwards* set forth a bright-line rule that all questioning must cease after an accused requests counsel." *Id.* at 989 (¶24) (quotation marks omitted) (quoting *Smith v. Illinois*, 469 U.S. 91, 98 (1984)). "In the absence of such a bright-line prohibition, the authorities through badgering or overreaching—explicit or subtle, deliberate or unintentional—might otherwise

11

wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." *Id.* at 989-90 (¶24) (quotation marks and brackets omitted) (quoting *Smith*, 469 U.S. at 98). "The rationale of *Edwards* is that once a suspect indicates that he is not capable of undergoing custodial questioning without advice of counsel, any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the inherently compelling pressures and not the purely voluntary choice of the suspect." *Maryland v. Shatzer*, 559 U.S. 98, 104-05 (2010) (brackets and quotation marks omitted).

¶28.　Moreover, when we say that "interrogation must cease," *Miranda*, 384 U.S. at 474, it is important to keep in mind that

> the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.

*Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Finally, we emphasize that "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived . . . his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475. Indeed, "the prosecution bears the burden of proving beyond a reasonable doubt each fact which is

prerequisite to admissibility." *Kirkland v. State*, 559 So. 2d 1046, 1047 (Miss. 1990).

¶29.    In the present case, no more than twelve minutes elapsed between Winstead's invocation of his right to counsel and the resumption of the interrogation.[8]    Edmondson testified that after Winstead invoked his right to counsel, he stopped "asking [Winstead] questions" and got him something to drink.    Winstead and Carpenter also testified that Winstead was allowed to use the restroom.    But Edmondson also testified that he continued to talk to Winstead and tell him that it would be in "his best interest to speak."    For example, Edmondson testified:

> Q.    Did you or Trooper Carpenter make anymore inquiries of Mr. Winstead during that time?
>
> A.    As far as asking the questions, no. We just kind of talked and told him that, I mean, it's his best interest to speak.  But, you know, it is what it is.
>
> Q.    Did the interview resume at some point?
>
> A.    It did when he requested it.
>
> Q.    What did he say?
>
> A.    He said, "I'll talk to you."

Edmondson also testified, "Like I said, it's in your best interest and then we would talk.  And he says, ['']All right.  I'll talk to you[.] . . . I'll talk.[']"  Edmondson testified he reminded

---

[8] The parties both describe a twenty-minute gap between the first and second recordings, stating that the first ended at 12:51 a.m. and the second began at 1:11 a.m. Those times are noted on Winstead's *Miranda* waiver forms, but they do not appear to be the times when Winstead invoked his right to counsel and when his interrogation resumed. Based on Edmondson's clear statements on the recordings and the length of the recordings, Winstead invoked his right to counsel at approximately 12:56 a.m., and the interrogation resumed at approximately 1:08 a.m.  *See supra* notes 3 & 5.

Winstead that he had previously requested a lawyer, but Winstead said, "Mr. Brad, I'll speak to you." Edmondson testified that he then "cautiously" restarted the interrogation. Edmondson described his advice regarding Winstead's "best interests" as just "small talk." Based on Edmondson's testimony, there is no indication that this "small talk" ever ceased during the twelve-minute gap between the two recordings. Rather, accepting Edmondson's testimony, it appears that Winstead relented and agreed to resume the interrogation without a lawyer in direct response to Edmondson's continuing advice and encouragement.

¶30. Thus, even viewing the evidence in the light most favorable to the trial court's ruling and findings of fact, *see Glasper*, 914 So. 2d at 716 (¶21), the State failed to prove beyond a reasonable doubt that the initial conversation between Edmondson and Winstead ever ceased or that Winstead voluntarily reinitiated their conversation. Rather, the evidence shows that Edmondson continued to subtly prod the unrepresented Winstead that it would be in his "best interest" to give a statement until Winstead abandoned his prior request for a lawyer and gave an uncounseled confession. As stated above, "[t]he rationale of *Edwards* is that once a suspect indicates that he is not capable of undergoing custodial questioning without advice of counsel, any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the inherently compelling pressures and not the purely voluntary choice of the suspect." *Shatzer*, 559 U.S. at 104-05 (brackets and quotation marks omitted). The trial court therefore erred by denying Winstead's motion to suppress and admitting the second recording into evidence.

¶31. Although we conclude that the trial court erred, that does not end our analysis. "The

admission of confessions obtained in violation of *Edwards* and its progeny constitutes trial error, and is therefore amenable to harmless error analysis." *Haynes*, 934 So. 2d at 991 (¶31) (quoting *Goodwin v. Johnson*, 132 F.3d 162, 181 (5th Cir. 1997)). "In order for a violation of a constitutional right to be held harmless, this Court must determine that the violation was harmless beyond a reasonable doubt." *Id.* (citing *Chapman v. California*, 386 U.S. 18, 23 (1967)). "[E]rrors involving a violation of an accused's constitutional rights may be deemed harmless beyond a reasonable doubt where the weight of the evidence against the accused is overwhelming." *Id.* (quoting *Clark v. State*, 891 So. 2d 136, 142 (¶29) (Miss. 2004)). "We will not reverse a conviction based on a harmless error." *Chaupette v. State*, 136 So. 3d 1041, 1047 (¶12) (Miss. 2014).

¶32.    We conclude that the error in admitting the second recording was harmless due to the overwhelming evidence of Winstead's guilt. The admissible evidence clearly established that Winstead's truck struck and killed Nolan and that Winstead left the scene. As recounted above, Winstead admitted in the first recording that he had been involved in the accident and left the scene, although he maintained that he thought he hit a dog. In addition, a piece of the grille of Winstead's truck was found at the scene of the accident, Nolan's blood was on Winstead's truck, and Madison identified Winstead as the driver of the truck.

¶33.    Moreover, there was overwhelming admissible evidence that Winstead knew that his truck hit a child, not a dog, before he fled the scene of the accident. Both Madison and Williams testified that Winstead, upon returning to the scene, got out of his truck and clearly saw the consequences of his actions. Madison testified that Winstead approached her and

15

spoke to her before turning and fleeing the scene. Williams corroborated Madison's testimony, stating that he could hear Winstead and Madison talking, although he could not make out what they were saying. Williams further testified that Winstead was close to Madison, who was holding Nolan—essentially, "[f]ace to face" with Madison. In short, even without the second recording, the evidence overwhelmingly established Winstead's guilt of the crime of leaving the scene of an accident resulting in death.[9] Therefore, the error in admitting the second recording was harmless and does not require reversal.

## II.     The Bloodstain Card

¶34.    Winstead argues that his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution were "violated because the trial court allowed an analyst to testify to a bloodstain card [that] he did not collect or test." Winstead further argues that "no witness was able to authenticate the bloodstain card that was offered as supposedly containing Nolan's DNA as to how it was taken or stored."

¶35.    "This Court reviews the trial court's decision to admit or exclude evidence under an

---

[9] The relevant statute, Mississippi Code Annotated section 63-3-401(1), provides that "[t]he driver of any vehicle involved in an accident resulting in injury to or death of any person shall immediately stop such vehicle at the scene of such accident or as close thereto as possible but shall then forthwith return to and in every event shall remain at the scene of the accident until he has fulfilled the requirements of Section 63-3-405." Subsection (4) provides that any driver involved in an accident resulting in death who "willfully fails to stop or to comply with the requirements [of] subsection (1)" is guilty of felony punishable by imprisonment for five to twenty years. Section 63-3-405 (Rev. 2022) requires the driver to stop at the scene of the accident, identify himself, provide certain information, and "render to any person injured in such accident reasonable assistance, including the carrying, or the making of arrangements for the carrying, of such person to a physician, surgeon or hospital for medical or surgical treatment if it is apparent that such treatment is necessary or if such carrying is requested by the injured person."

abuse of discretion standard of review." *Deeds v. State*, 27 So. 3d 1135, 1140-41 (¶15) (Miss. 2009) (quoting *Smith v. State*, 986 So. 2d 290, 295 (¶12) (Miss. 2008)). We "will affirm the trial court's ruling unless we can safely say that the trial court abused its judicial discretion in allowing or disallowing evidence so as to prejudice . . . the accused." *Id.* (quotation marks omitted). We review constitutional issues de novo. *Id.*

¶36. The Sixth Amendment guarantees "the accused . . . the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. As interpreted by the United States Supreme Court, the Confrontation Clause prohibits the admission of an absent declarant's testimonial statements unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. *Bullcoming v. New Mexico*, 564 U.S. 647, 658 (2011). "[A] statement is testimonial when it is given to the police or individuals working in connection with the police for the purpose of prosecuting the accused." *Hobgood v. State*, 926 So. 2d 847, 852 (¶12) (Miss. 2006). The United States Supreme Court has also held that the certification of an analyst who prepared a blood-alcohol analysis report "is 'testimonial,' and therefore within the compass of the Confrontation Clause." *Bullcoming*, 564 U.S. at 658-59. As the Court put it, there is no "forensic evidence exception" to the defendant's right of confrontation. *Id.* at 658 (quotation marks omitted). "Accordingly, . . . analysts who write reports that the prosecution introduces must be made available for confrontation . . . ." *Id.* at 661. However, the introduction of a "physical blood specimen" into evidence does not implicate the Confrontation Clause because such evidence is not a "statement[]," testimonial or otherwise. *Deeds*, 27 So. 3d at 1143 (¶23).

¶37. In *Deeds*, the defendant argued that his Sixth Amendment right to confront witnesses was violated because the State did not identify the nurse who drew his blood, which was admitted as evidence at trial in his prosecution for driving under the influence. *Id.* at 1142-43 (¶22). The Supreme Court reasoned that "[n]either the procedure used to draw Deeds's blood, nor the physical blood specimen itself, are statements, nor do they constitute nonverbal conduct intended as an assertion. Contrary to the defendant's claims, the unidentified nurse was not a witness against [him]." *Id.* at 1143 (¶23).

¶38. Similarly, the bloodstain card admitted at Winstead's trial was real physical evidence, not testimonial evidence. It contained blood samples taken by the medical examiner's office during the autopsy. Because the card was not testimonial in nature, its admission did not violate Winstead's rights under the Confrontation Clause. Therefore, the trial court did not err by allowing the card to be admitted into evidence at trial.

¶39. Although Winstead's argument primarily focuses on the Confrontation Clause, he also alludes to issues related to "chain of custody" and authenticity. However, the Confrontation Clause "does not require 'that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person or as part of the prosecution's case.'" *Id.* at 1143 (¶24) (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 312 n.1 (2009)). An "argument that the State failed to prove 'chain of custody' is a challenge to the authenticity of the evidence." *Id.* at 1142 (¶19). And "gaps in the chain of custody normally go to the weight of the evidence rather than its admissibility." *Id.* (brackets and quotation marks omitted) (quoting *Melendez-Diaz*, 557 U.S.

18

at 312 n.1).

¶40. "Mississippi law has never required a proponent of evidence to produce every handler of evidence." *Id.* at (¶20) (quoting *Ellis v. State*, 934 So. 2d 1000, 1005 (¶21) (Miss. 2006)). "In order for the defendant to show a break in the chain of custody, there must be an indication or reasonable inference of probable tampering with the evidence or substitution of the evidence." *Id.* (quotation marks omitted). "The defendant has the burden of proving tampering or substitution of the evidence, and a mere suggestion that substitution could possibly have occurred does not meet the burden of showing probable substitution." *Id.* (brackets and quotation marks omitted).

¶41. In *Corrothers v. State*, 148 So. 3d 278 (Miss. 2014), a capital murder/death penalty case, the defendant raised a chain-of-custody objection to bullets that had been removed from the decedents' bodies during their autopsies. *Id.* at 311 (¶84). The sponsoring witness, Investigator Mills, testified

> that he had received the bullets from the crime lab. He stated that, although he had not personally witnessed the bullets being removed from the decedents by the medical examiner or the transfer of the bullets from the medical examiner to the crime lab, the standard procedure, which appeared to have been followed, was for that to happen. Investigator Mills further stated that [another law enforcement officer] had picked up the bullets from the crime lab and delivered them to Mills.

*Id.* at 312 (¶85). The Supreme Court found "no abuse of discretion in the trial court's decision to admit the bullets" because "Mills provided the court with an explanation of the transfer of the bullets from the medical examiner's office to the crime lab." *Id.* at 312 (¶87). Moreover, "[n]o indication or reasonable inference of substitution or tampering with the

19

bullets arose from [Mills's testimony]." *Id.* The Court emphasized that the defendant merely "took issue only with the fact the medical examiner did not testify; [the defendant] did not point to anything that indicated tampering or substitution." *Id.*

¶42.   Similarly, the trial court in this case found no "evidence . . . to show that there was some sort of tampering or chain of custody issue" with the bloodstain card and that "a reasonable juror could find [the card] authentic." The trial court's ruling was consistent with the Supreme Court's decision in *Corrothers*. As discussed above, although Holly did not personally collect the blood samples on the card, he testified that the forensics laboratory regularly received such specimens from the medical examiner's office in the normal course of operations at the Department of Public Safety. There was no evidence that there was anything out of the ordinary about this transfer; nor was there "anything that indicated tampering or substitution." *Corrothers*, 148 So. 3d at 312 (¶87). Accordingly, consistent with the Supreme Court's decision in *Corrothers*, the trial court did not abuse its discretion by admitting the evidence.[10]

## CONCLUSION

¶43.   For the reasons explained in Part I, the trial court erred by admitting statements made by Winstead after he invoked his right to counsel; however, the error was harmless in light of the overwhelming admissible evidence of Winstead's guilt. The trial court did not abuse its discretion by admitting the bloodstain card. Therefore, we affirm Winstead's conviction

---

[10] Although we find that the trial court's ruling was consistent with *Corrothers* and not an abuse of discretion, we also note that any error in admitting the bloodstain card would have been harmless. Other admissible evidence had already overwhelmingly established that Winstead's truck struck Nolan.

and sentence.

¶44. **AFFIRMED.**

**BARNES, C.J., WESTBROOKS, McDONALD, McCARTY AND EMFINGER, JJ., CONCUR. CARLTON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. GREENLEE AND SMITH, JJ., CONCUR IN PART AND DISSENT IN PART WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J., GREENLEE AND SMITH, JJ.**

**LAWRENCE, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶45. I concur with the majority on all issues except its finding that the admission of Winstead's second police interview was error. The issue in this case is whether Winstead reinitiated contact and waived his *Miranda* rights in agreeing to speak to the police after his request to speak to an attorney.

¶46. The Mississippi Supreme Court has held that the fact-finding function of the trial court is "not disturbed" on appeal "unless the trial judge applied an incorrect legal standard, committed manifest error, or the decision was contrary to the overwhelming weight of the evidence." *Thorson v. State*, 895 So. 2d 85, 115 (¶73) (Miss. 2004) (quoting *Lee v. State*, 631 So. 2d 824, 826 (Miss. 1994)). "Because the standard of manifest error is high, we will not reverse unless the trial court's ruling [to admit evidence] contravened the substantial weight of the evidence." *Batiste v. State*, 121 So. 3d 808, 858 (¶122) (Miss. 2013). Such a time-tested approach allows the trial court the ability to determine whether the suspect reinitiated conversation with law enforcement and voluntarily waived his *Miranda* rights or not.

¶47. Here, it is without dispute that Winstead was read his *Miranda* rights and waived

21

those rights to speak with investigators. He did not want to provide a potential witness's name to the police during the first interview. Winstead then indicated he wanted to speak with an attorney before he provided such a name. Minutes later, he told police he would continue with his interview. There is some dispute as to the exact amount of time between the first and second interviews. The detectives testified they were unsure but suspected about "20 minutes." Edmonson testified, "I just hesitate to give any kind of exact time." The trial court used the times on the "Waiver of Miranda" forms and the "stopping and starting of the recording" to conclude it was "approximately a 20 minute period of time." Whatever time actually passed before the second interview, there is no doubt the police read Winstead his *Miranda* rights to him a second time, and Winstead, again, waived those rights and indicated he wanted to speak with the police.

¶48. Investigator Edmonson testified the interview continued when Winstead "requested it" by saying, "I'll talk to you." Before that, Edmonson testified about the period of time between the two interviews:

| STATE: | Did you or trooper Carpenter make anymore inquiries of Mr. Winstead during that time? |
|---|---|
| EDMONSON: | As far as asking questions, no. We just kind of talked and told him that, I mean, it's his best interest to speak. But, you know, it is what it is. |

Trooper Carpenter, who was also present, testified as follows:

| STATE: | Where - - what did you and Lieutenant Edmonson do afterwards? |
|---|---|
| CARPENTER: | This interview was concluded at 12:51 a.m., approximately 21 minutes to the interview. A break was established afterwards where water and a bathroom break was taken. Afterwards, we gathered back into the room |

22

|  |  |
|---|---|
|  | where **Mr. Winstead stated he wished to continue to speak** - - |
| STATE: | During the interview - - |
| CARPENTER: | - - without an attorney present. |
| STATE: | During that intervening time, did you or Lieutenant Edmonson attempt to persuade him or bully him into making - - continuing the statement? |
| CARPENTER: | No. |
| STATE: | Use any threats against him, any violence? |
| CARPENTER: | No. |
| STATE: | Tell him he would be better off or any words to that effect? |
| CARPENTER: | No. . . . |
| STATE: | So he initiated it? |
| CARPENTER: | Yes. |
| STATE: | Was it explained to him that he didn't have to? |
| CARPENTER: | Yes. . . . Once we got back to the room that we were originally in, we sat down and issued another Miranda. |

(Emphasis added). Later, after the judge asked questions and during another cross-examination of Carpenter, the following exchange occurred:

|  |  |
|---|---|
| WINSTEAD'S ATTORNEY: | [Y]ou say that Edmonson said, "I believe it's in your best interest to get a lawyer"? |
| CARPENTER: | Yes. |

¶49. The trial judge also heard from Winstead, who painted a remarkably different version of the time period between the first and second interviews. Winstead testified that after the first interview, within minutes, Edmondson "made eye contact" and changed "180 degree difference" and scared him by using the "F-bombs" and "scare tactics and put fear into me." Winstead testified Edmondson kept telling him to tell his side of the story but did it in a way that Winstead felt like he would go to jail if he did not talk. Winstead admitted that he knew the second interview was being recorded, he was re-read his Miranda rights before the second interview, and he signed a waiver of those rights indicating he agreed to talk.

23

¶50. During arguments on the motion to suppress, the State maintained that there were "two versions of what happened in that 20 minutes." The State pointed out that the trial court did not have to rely on those two versions. The State argued that the "second statement" started out with, "[Y]ou stated you wish to continue the interview," and Winstead answered, "[Y]es." The trial judge also noted, "[T]here's disagreement between what was actually said between Lieutenant Edmondson in this case and defendant." The trial judge, after hearing the testimony and weighing the credibility of the witnesses, held that the second interview was admissible because Winstead reinitiated the conversation. In making that determination, the trial court did not apply an incorrect legal standard, commit manifest error, or make a decision that was contrary to the overwhelming weight of the evidence. *Thorson*, 895 So. 2d at 115 (¶73). Further, the court had substantial evidence to support its factual findings precluding a conclusion that the trial court "contravened the substantial weight of the evidence." *Batiste*, 121 So. 3d at 858 (¶122).

¶51. The trial court did not consider just one person's testimony but rather considered all three witnesses and the exhibits introduced at the hearing. The trial court gave more weight and worth to the investigator's testimony. This Court should not impose its own factual findings over those of the trial court when evidence contained in the record supports the trial court's factual determinations. *Hamer v. State*, 318 So. 3d 1173, 1180 (¶24) (Miss. Ct. App. 2020). The evidence conflicted as to what happened between Winstead's two interviews. It is the trial court's function to resolve those conflicts in the evidence. *See Taylor v. State*, 789 So. 2d 787, 792 (¶21) (Miss. 2001). Here, the officers testified, and Winstead testified.

24

The stories were contradictory and vastly different. It was the role of the trial court to make those factual determinations after weighing the credibility of the witnesses. *See Scott v. State*, 8 So. 3d 855, 861 (¶25) (Miss. 2008). The trial judge weighed the credibility of those witnesses and the evidence and made a factual and legal determination supported by the evidence produced at the suppression hearing. I would affirm the trial court's factual determinations and legal conclusions. Therefore, I respectfully dissent from the part of the majority opinion holding the trial court in error for admitting the second interview into evidence.

**CARLTON, P.J., GREENLEE AND SMITH, JJ., JOIN THIS OPINION.**